# EXHIBIT B

STATE OF CALIFORNIA

CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY

DEPARTMENT OF TOXIC SUBSTANCES CONTROL

| | |
|---|---|
| In the Matter of:<br><br>BKK Landfills and<br>Leachate Treatment Plant<br>2210 South Azusa Avenue<br>West Covina, California 91792<br><br>Respondents:<br><br>American Honda Motor Company, Inc.<br><br>Appliance Industries, Inc., a division of W.R. Grace and Company<br><br>Appropriate Technologies II, Inc.<br><br>Atlantic Richfield Corporation<br><br>BKK Corporation<br><br>Boeing Company, successor to Douglass Aircraft Company<br><br>Brady Investment Company, successor to Precision Metals, Inc.<br><br>California Department of Transportation<br><br>Chemical Waste Management, Inc.<br><br>Chevron U.S.A., Inc., a subsidiary of ChevronTexaco, Inc.<br><br>Clean-Steel, Inc.<br><br>Ducommon AeroStructures Inc., successor to AHF-Ducommon;<br><br>Energy Merchant Corporation, successor to Powerine Oil Company<br><br>Enthone, Inc.<br><br>ExxonMobil Oil Corporation<br><br>Exxon Mobil Corporation | Docket No. I/SE-D 04/05-004<br><br>**IMMINENT AND SUBSTANTIAL ENDANGERMENT DETERMINATION AND ORDER AND REMEDIAL ACTION ORDER**<br><br>Health and Safety Code Sections 25355.5(a)(1)(B), 25358.3(a), 58009 and 58010 |

The Federal Reserve Bank )
Gemini Industries, Inc. )
General Motors Corporation )
Golden West Refining Company )
Honeywell International Corporation )
International Light Metals Corporation )
Kaiser Ventures, LLC., successor to Kaiser Ventures, Inc. )
Laidlaw International, Inc., successor to Laidlaw Environmental Services )
Lockheed Martin Corporation, successor to Lockheed California )
Los Angeles Department of Water and Power )
Martin Marietta Carbon, Inc. )
National Steel and Shipbuilding Company )
Pacific Coast Drum )
P.W. Stevens, Inc. )
Quemetco, Inc. )
Raytheon Company, successor to Hughes Missile Systems )
RME Petroleum Company, a subsidiary of Anadarko Petroleum Corporation )
Robertson-Ceco, successor to the H.H. Robertson Company, successor to Northrop Architectural Systems )
Rohr, Inc., a subsidiary of B.F. Goodrich Corporation )
Scovill, Inc. )
Shell Oil Company )

Southern California Edison

Stauffer Management Company, LLC, successor to Stauffer Chemical Company

Texaco Exploration and Production, a subsidiary of ChevronTexaco Inc.

Texaco Inc., a subsidiary of ChevronTexaco, Inc.

Thums Long Beach Company

Todd Pacific Shipyards Corporation, a subsidiary of Todd Shipyards Corporation

Union Oil Company of California

United States Navy

U.S. Filter Recovery Services (California), Inc.

Washington Mutual Bank, successor to Home Savings of America, FSB, subsidiary of Washington Mutual, Inc.

Waymire Drum and Container Company, Inc.

Western Oil and Refining Company

Western Waste Industries

Xerox Corporation

## I. INTRODUCTION

1.1 Parties. The California Environmental Protection Agency, Department of Toxic Substances Control (DTSC) issues this Imminent and Substantial Endangerment Determination Order and Remedial Action Order (Order) to: American Honda Motor Company, Inc., a California corporation; Appliance Industries, Inc., a division of W.R. Grace and Company, a Connecticut corporation; Appropriate Technologies II, Inc., a California corporation; Atlantic Richfield Corporation, a Delaware corporation; BKK Corporation, a California corporation; the Boeing

Company, a Delaware corporation, successor to Douglas Aircraft Company; Brady Investment Company, a California corporation, successor to Precision Metals, Inc.; the California Department of Transportation, an agency of the State of California; Chemical Waste Management, Inc., a Delaware corporation; Chevron U.S.A., Inc., a Pennsylvania corporation, subsidiary of ChevronTexaco, Inc.; Clean-Steel, Inc., a California corporation; Ducommon AeroStructures Inc., a Delaware corporation, successor to AHF-Ducommon; Energy Merchant Corporation, a Delaware corporation, successor to Powerine Oil Company; Enthone, Inc., a Delaware corporation; ExxonMobil Oil Corporation, a New York corporation; Exxon Mobil Corporation, a New Jersey corporation, ; the Federal Reserve Bank, an agency of the United States Government; Gemini Industries, Inc., a California corporation; General Motors Corporation, a Delaware corporation; Golden West Refining Company, a California corporation; Honeywell International, a Delaware corporation, successor to Garrett Engine Boosting Systems; International Light Metals Corporation, a California corporation; Kaiser Ventures, LLC., a Delaware limited liability corporation, successor to Kaiser Ventures, Inc.; Laidlaw International, Inc., a Delaware corporation, successor to Laidlaw Environmental Services; Lockheed Martin Corporation, a California corporation, successor to Lockheed California Company; Los Angeles Department of Water and Power, a municipal utility and department of the City of Los Angeles; Martin Marietta Carbon, Inc., a California corporation; National Steel and Shipbuilding Company, a Nevada corporation; Pacific Coast Drum, a California corporation; P.W. Stevens, Inc., a California corporation; Quemetco Inc., a Delaware corporation; Raytheon Company, a California corporation, successor to Hughes Missile Systems; RME Petroleum Company, a Delaware corporation, and a subsidiary of Anadarko Petroleum Corporation.; Robertson-Ceco, a Pennsylvania corporation, successor to the H.H. Robertson Company, successor to Northrop Architectural Systems; Rohr Inc., a Delaware corporation and a subsidiary of B.F. Goodrich Corporation; Scovill, Inc., a Connecticut corporation; Shell Oil Company, a Delaware corporation;

Southern California Edison, a California corporation; Stauffer Management Company, LLC, a Delaware limited liability corporation, successor to Stauffer Chemical Company; Texaco Exploration and Production, a Delaware corporation and a subsidiary of ChevronTexaco, Inc.; Texaco Inc., a Delaware corporation and a subsidiary of ChevronTexaco, Inc.; Thums Long Beach Company, a Delaware corporation; Todd Pacific Shipyards Corporation, a Delaware corporation, a subsidiary of Todd Shipyards Corporation; Union Oil Company of California, a California corporation; the United States Navy, a department within the United States Department of Defense; U.S. Filter Recovery Services (California), Inc., a Delaware corporation; Washington Mutual Bank, a Washington corporation, successor to Home Savings of America, FSB and a subsidiary of Washington Mutual, Inc.; Waymire Drum and Container Company, Inc., a California corporation; Western Oil and Refining Company, a California corporation; Western Waste Industries, a California corporation; and Xerox Corporation, a New York corporation (Respondent(s)).

1.2 Facility/Site. This Order applies to the property located at 2210 South Azusa Avenue, West Covina, Los Angeles County, California 91792 (the Facility). The Facility consists of 583 acres and can be described by the Government Survey Method as: that portion of Rancho La Puente in the City of West Covina, County of Los Angeles known as Lot 3, as shown on a record of survey recorded in Book 85, pages 10 through 12 inclusive, on file in the Office of the County Recorder in said county. A map showing the Facility is attached as Exhibit A. This Order applies to the Facility and the areal extent of contamination that resulted from activities on the Facility (the Site). The BKK Corporation (BKK) owns a 425.172 -acre portion of the Facility known as Parcel 3. The City of West Covina owns Parcels 1 and 2, which comprise the balance of the Facility. Parcel 3 contains the two landfills, the leachate treatment plant (LTP) and the inactive Area D Class II disposal area (Area D).

1.3 Permitting Status. BKK owns and is the operator of the following units: (a) a closed hazardous waste landfill (Class I); (b) an inactive municipal landfill (Class III) that is in the process of closing; (c) an operating leachate treatment plant (LTP); and (d) the inactive Area D disposal area.

In the late 1980's, BKK closed the Class I Landfill under a Closure Plan approved by the California Department of Health Services (predecessor agency to DTSC) and the United States Environmental Protection Agency. DTSC provided acknowledgment of the closure certification on June 12, 1991. The Department now regulates the post-closure care of the Class I Landfill. BKK is required to monitor and perform post-closure environmental care of the Class I Landfill pursuant to the terms of an Interim Status Document (ISD) and the Operation Plan (also referred to as the "Post-closure Plan" or "Operation/Post-closure Plan," which is part of BKK's Part B application for post-closure permit 04-GLN-07). BKK has been operating the LTP under the terms of a hazardous waste facility permit that became effective June 30, 1987 (the LTP Permit).

On June 30, 2004, the Department issued a consolidated Hazardous Waste Facilities Permit: Leachate Treatment Plant Operation and Class I Landfill Post-Closure Care (Permit No. 04-GLN-07, referred to as the "2004 Permit"). BKK has appealed the 2004 Permit. BKK is required to continue to operate the LTP pursuant to the LTP Permit issued in 1987 and conduct post-closure operation, monitoring and maintenance of the Class I landfill pursuant to the Operation Plan until DTSC notifies BKK that some or all of the 2004 Permit conditions are in effect and/or are not stayed by the appeal. BKK's activities at the Site are also regulated by the Health and Safety Code and the California Code of Regulations, title 22.

The Class III landfill began operating in 1987 and it is undergoing closure. The California Integrated Waste Management Board (CIWMB) approved the Final Closure and Post-closure Maintenance Plans for the Class III Landfill on August 2, 2002. The City of West Covina is the local enforcement agency (LEA) for the Class III landfill.

The United States Environmental Protection Agency (U.S. EPA) is responsible for overseeing corrective action (investigation and cleanup) work related to any releases of leachate from the landfills and any other releases pursuant to the federal Resource Conservation and Recovery Act (RCRA). U.S. EPA issued its corrective action remedy titled "U.S. EPA Decision on BKK's May 28, 2004 Revised Corrective Measure Implementation Plan (CMIP)" on June 30, 2004. U.S. EPA also plans to issue an air remedy in the future.

The Los Angeles Regional Water Quality Control Board (LARWQCB) regulates the discharge of treated effluent pursuant to waste discharge requirements (WDRs). Runoff from both landfill covers goes to storm water drains under a General Storm Water permit issued by the LARWQCB. The South Coast Air Quality Management District (SCAQMD) regulates emissions from the landfills and flare stations.

1.4 <u>Jurisdiction</u>. This Order is issued by DTSC to Respondents pursuant to its authority under Health and Safety Code sections 25358.3(a), 25355.5(a)(1)(B), 58009 and 58010.

Health and Safety Code section 25358.3(a) authorizes DTSC to take various actions, including issuance of an Imminent or Substantial Endangerment Determination and Order, when DTSC determines that there may be an imminent or substantial endangerment to the public health or welfare or to the environment, because of a release or a threatened release of a hazardous substance.

Health and Safety Code section 25355.5(a)(1)(B) authorizes DTSC to issue an order establishing a schedule for removing or remedying a release of a hazardous substance at a site, or for correcting the conditions that threaten the release of a hazardous substance.

Health and Safety Code section 58009 authorizes DTSC to commence and maintain all proper and necessary actions and proceedings to enforce its rules and regulations; to enjoin and abate nuisances related to matters within its jurisdiction which are dangerous to health; to compel the performance of any act specifically

enjoined upon any person, officer, or board, by any law of this state relating to matters within its jurisdiction; and/or on matters within its jurisdiction, to protect and preserve the public health.

Health and Safety Code section 58010 authorizes DTSC to abate public nuisances related to matters within its jurisdiction.

## II. FINDINGS OF FACT

DTSC hereby finds:

2.1 Liability of Respondent(s). Respondent(s) are responsible parties or liable persons as defined in Health and Safety Code section 25323.5.

Respondent Washington Mutual Bank is the successor to Home Savings of America, FSB (Home Savings). Home Savings owned the Facility from 1962 to 1976 and was an owner and operator of the Class I landfill from the time of its inception until 1976. The Class I landfill accepted non-hazardous and hazardous waste.

BKK Corporation (BKK) purchased the Facility from Home Savings in 1976. BKK owned and operated the Facility until 2003. In 2003, BKK sold Parcels 1 and 2, but continued to be the operator of the entire Facility. BKK retained ownership of Parcel 3 and continues to be the owner and operator of the Class I landfill, the Class III landfill and the LTP.

American Honda Motor Company, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Appliance Industries, Inc., a division of W.R. Grace and Company arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Appropriate Technologies II, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Atlantic Richfield Corporation arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

///

Boeing Company, successor to Douglas Aircraft Company arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Brady Investment Company, successor to Precision Specialty Metals, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

The California Department of Transportation arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Chemical Waste Management, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Chevron U.S.A. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Clean Steel, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

DuCommon AeroStructures, Inc., successor to AHF-Ducommon arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Energy Merchant Corporation, successor to Powerine Oil Company arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Enthone, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

ExxonMobil Oil Corporation arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Exxon Mobil Corporation, under the trade or fictitious name Exxon Chemical Americas arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

///

The Federal Reserve Bank arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Cemini Industries, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

General Motors Corporation arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Golden West Refining Company arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Honeywell International, under the trade or fictitious names Honeywell Aerospace and Garrett Engine Boosting Systems arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

International Light Metals Corporation arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Kaiser Ventures, LLC, successor to Kaiser Ventures, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Laidlaw International, Inc., successor to Laidlaw Environmental Services arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Lockheed Martin Corporation, successor to Lockheed California arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

The Los Angeles Department of Water and Power arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Martin Marietta Carbon, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

///

National Steel and Shipbuilding Company arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Pacific Coast Drum arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

P.W. Stevens, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Quemetco, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Raytheon Company, successor to Hughes Missile Systems arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

RME Petroleum Company arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Robertson-Ceco Corporation, successor to the H.H. Robertson Company, successor to Northrup Architectural Systems arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Rohr, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Scovill, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Shell Oil Company arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Southern California Edison arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Stauffer Management Company, LLC, successor to Stauffer Chemical Company arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

///

Texaco, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Texaco Exploration and Production arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Thums Long Beach Company arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Todd Pacific Shipyards Corporation arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Union Oil Company of California arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

The United States Navy, Long Beach Naval Shipyard arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

U.S. Filter Recovery Services (California), Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Waymire Drum and Container Company, Inc. arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Western Oil and Refining Company arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Western Waste Industries arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

Xerox Corporation arranged by contract, agreement or otherwise for the disposal of its hazardous substances/wastes at the Facility.

2.2 History and Physical Description of the Facility/Site. Home Savings obtained the original regulatory approvals for the Class I landfill and in 1963, Home Savings leased the Facility to BKK to begin operating the Class I landfill. Lease payments were a function of the base rent and the amount of waste accepted.

///

Home Savings sold the Facility to BKK in 1976. The Class I landfill ceased accepting hazardous waste in 1984, except for asbestos.

BKK owned the entire Facility from 1976 until 2003, when it sold Parcels 1 and 2 to the City of West Covina. As discussed above, BKK retained ownership of Parcel 3, which includes the Class I and Class III landfills, the LTP and Area D and BKK remained the operator of the Facility.

During its operating life, the unlined Class I landfill accepted both municipal and hazardous waste. From 1972 to 1984, the Class I landfill accepted approximately 3.4 million tons of liquid and solid hazardous wastes, together with large amounts of nonhazardous wastes. The Class III landfill operated from 1987 to 1996. The LTP, which serves both landfills, has been operating since 1987. Both landfills have gas collection systems.

A single gas and leachate collection system addresses both landfill units. Collected landfill leachate, gas condensate, and contaminated groundwater are treated at the onsite LTP. The LTP treats leachate from both landfills. The treated effluent is mixed with purchased water and used for irrigation of the Class I landfill cap.

Higher energy-content gas collected from central landfill areas goes to an onsite cogeneration plant where electricity is generated by a gas turbine and gas boiler system. The plant is owned and operated by Minnesota Methane West Covina (MMWC), which leases land from BKK and also pays BKK a fee for maintenance of the gas lines. BKK and MMWC have had a contractual agreement through which BKK provides landfill gas (methane) to the plant and BKK receives free electricity for use at the BKK facility. Lower energy-content gas from peripheral landfill areas is piped to flare stations.

Residential and industrial uses have continued to develop around the Site. The nearest residential areas are now to the southeast and northwest of the Site. To the southeast, several homes are only 25 to 50 feet away.

On July 17, 1984, the Southern California Gas Company reported elevated levels of gases in yards and nearby residences. U.S. EPA evacuated 19 homes south and southeast of the Site due to the presence of vinyl chloride (a known human carcinogen) inside homes at levels up to 90 times the ambient air standard. U.S. EPA completed relocation of the affected residents in early 1985.

On October 18 and 20, 2004, BKK notified DTSC that for financial reasons, BKK would no longer be able to perform required post-closure care of the Class I landfill, including operation of the LTP, after November 17, 2004. As a result, DTSC has hired a contractor to conduct emergency response activities at the Site. These activities are necessary to ensure continuous maintenance and operation of systems that are essential to protect public health, safety and the environment.

2.3 Hazardous Substances Found at the Site. Wastes disposed at the Class I landfill include (but are not limited to) acid and alkaline solutions and sludges; cyanide wastes; contaminated soils, drilling muds, and petroleum wastes; heavy metal solutions; oils; paint wastes; plating solutions; pesticides; polychlorinated biphenyls (PCBs); phenolic wastes; and halogenated solvents. Some of the key contaminants of concern that have been identified on the Site include: acetone (36,000 ug/L – leachate), benzene (1,900 ug/L - leachate), chlorobenzene (4,800 ug/L - leachate), chromium, copper (120,000 mg/Kg -waste zone), cyanide, lead, mercury, methane, PCBs, toluene (7,500 ug/L - leachate), vinyl chloride (2,300 ug/L - leachate), and xylenes (3,300 ug/L - leachate).

The Site currently has an integrated gas collection system and groundwater/leachate extraction wells for the two landfills. The LTP treats the leachate from the two landfills. Releases of methane and vinyl chloride from the gas collection wells may occur. Onsite groundwater and landfill leachate contain the hazardous substances noted above.

///

///

2.4 Health Effects. The chemicals described in Paragraph 2.3. could cause serious adverse health effects if persons were exposed to them. Potential adverse effects Include:

2.4.1 Acetone – Acetone is moderately toxic by various routes of exposure and it is a skin and severe eye irritant. Systemic effects by inhalation or ingestion include nausea, vomiting, muscle weakness, coma, kidney damage, and changes in electroencephalogram readings (central nervous system changes). Acetone presents a potentially dangerous fire and explosion hazard.

2.4.2 Benzene – Benzene is a confirmed human carcinogen producing myeloid leukemia, Hodgkin's disease, and lymphomas via the inhalation exposure pathway. It is a human poison via the inhalation pathway and experimental evidence indicates via skin contact also. Benzene is moderately toxic by ingestion. Systemic effects Include blood changes and increased body temperature.

2.4.3 Chlorobenzene – Chlorobenzene, also referred to as Benzene Chloride, may have potential symptoms of overexposure that include irritation of skin, eyes, and nose. It may cause drowsiness and lack of coordination. Chlorobenzene has experimentally proven to have teratogenic and reproductive effects, with mutation data reported. It is moderately toxic by the ingestion route. Repeated exposure to low concentrations may cause kidney and liver damage. There have been incidences where workers exposed to high levels of chlorobenzene in the air complained of headaches, nausea, sleepiness, numbness, and vomiting. Animal studies indicate that the liver, kidney, and central nervous system are affected by exposure to chlorobenzene. Effects on the central nervous system from breathing chlorobenzene include unconsciousness, tremors, restlessness, and death. Longer exposure has caused liver and kidney damage.

2.4.4 Chromium – Chromium compounds and salts are suspected human carcinogens producing tumors in the lungs, nasal cavity, and paranasal sinus area. Some forms are confirmed human carcinogens. Toxicity varies depending on the type

of compound or salt, but chromium is generally considered moderately to highly toxic. It can cause corrosive action on the skin and mucous membranes.

2.4.5 Copper - Toxicity of copper varies depending on the salt or compound. It generally is moderate to low in toxicity to humans with high toxicity towards plants. Inhalation of dust has caused hemolysis of red blood cells and injury to lung cells. Systemic effects from ingestion include vomiting, gastric pain, anemia, convulsion, shock, coma, and death (deaths from copper ingestion have been recorded from exposures to as low as 27 grams of copper salts).

2.4.6 Cyanide – Cyanide is usually found joined with other compounds. It is very poisonous by most routes of exposure and can be readily absorbed from all routes, including skin, ingestion and inhalation. Death is caused by respiratory arrest and can occur within seconds or minutes by inhalation exposure of high concentrations of hydrogen cyanide gas. Ingestion of alkali cyanide salts causes death at a slower rate because of slow absorption. Death can occur with ingestion of even small amounts of sodium and potassium cyanide and can occur within minutes or hours depending on the route of exposure. Symptoms of exposure include salivation, nausea without vomiting, anxiety, confusion, vertigo and giddiness, lower–jaw stiffness, convulsions, paralysis, coma, cardiac arrythmias, and transient respiratory stimulation followed by respiratory failure. Exposure to high levels of cyanide for a short time harms the brain and heart and can cause coma and death. Workers who inhaled low levels of hydrogen cyanide over a period of years had breathing difficulties, chest pain, vomiting, blood changes, headaches, and enlargement of the thyroid gland. Mothers who have been exposed to high levels of cyanide during pregnancy have increased incidence of thyroid diseases in their children.

2.4.7 Lead – Short-term exposure to lead can cause reversible liver damage. Longer exposures at higher concentrations may result in progressive irreversible kidney damage and possible kidney failure. Anemia is an early manifestation of lead

poisoning. Lead is a cumulative poison with increasing amounts building up in the body until symptoms and disability occur. Systemic effects include anemia, headache, tremors, paralysis, hallucinations, and liver changes. The most serious effects associated with markedly elevated blood-lead levels are severe neurotoxic effects that include irreversible brain damage.

2.4.8 Mercury – Mercury is readily absorbed into the respiratory tract, skin, and the gastrointestinal tract. Experimental reports indicate that mercury can cause teratogenic and reproductive effects. Acute exposure to the solid salts produces violent corrosive effects on the skin and mucous membranes, severe nausea, vomiting, abdominal pain, bloody diarrhea, kidney damage, and death within 10 days. Chronic exposure effects include inflammation of the mouth and gums, excessive salivation, loosening of teeth, kidney damage, muscle tremor, jerky gait, spasms of extremities, personality changes, depression, irritability, and nervousness. Some mercury compounds have an affinity for the brain tissue and may cause permanent damage.

2.4.9 Methane – Methane is considered to be a simple asphyxiate. It is a very dangerous fire and explosion hazard when exposed to heat or flame.

2.4.10 Polychlorinated Biphenyls (PCBs) – PCBs are suspected carcinogens and teratogins. Some epidemiologic studies have also observed an elevated number of first-born infants with cleft pallets when pregnant mothers were exposed to PCBs. PCBs have been found to induce tumors in experimental animals after oral ingestion. Studies also indicate that PCBs contain trace amounts of dioxin and dibenzofurans that have been demonstrated to be extremely toxic to lab animals. Other health effects linked to exposure to PCBs include eye irritation and chloracne, which is a painful and disfiguring condition.

2.4.11 Toluene – Toluene is mildly toxic via inhalation. Human systemic effects by inhalation include central nervous system changes, hallucinations or distorted perceptions, motor activity changes, psycho physiological test changes, and

bone marrow changes. Experimental studies have reported teratogenic, severe skin and eye irritant, and reproductive effects. It is a very dangerous fire hazard when exposed to heat, flame, or oxidizers.

2.4.12 Vinyl Chloride – Vinyl Chloride is a confirmed human carcinogen that produces liver and blood tumors. It is considered to be moderately toxic by ingestion. There are human reproductive effects by inhalation by change in spermatogenesis. Human mutation data has been reported. Symptoms of exposure include severe irritant to skin, eyes, and mucous membranes. It causes skin burns by rapid evaporation and consequent freezing. In high concentration it acts as an anesthetic. Chronic exposure has produced liver injury. Circulatory and bone changes in the fingertips have been reported in workers handling unpolymerized materials. It is a very dangerous fire and explosion hazard when exposed to heat, flame, or oxidizers.

2.4.13 Xylene - Xylene is mildly toxic by the ingestion and inhalation routes of exposure. Human systemic effects by inhalation include changes in olfactory functions, conjunctiva irritation, and pulmonary changes. Experimental studies have reported teratogenic and reproductive effects as well as skin and eye irritation. Xylene is a very dangerous fire hazard when exposed to heat and flame.

2.5 <u>Routes of Exposure</u>.

2.5.1 Inhalation. Inhalation of hazardous substances is the primary potential route of exposure from BKK. Exposure to harmful landfill gases is possible as a result of the gas extraction facility's failure or degradation of the landfill cap, which could allow the release of landfill gases.

2.5.2 Direct Contact. Direct contact with hazardous substances could occur as a result of releases of hazardous substances from the landfills. Releases could occur through erosion of landfill caps and runoff of hazardous materials during wet weather. Failure to operate the groundwater/leachate collection system could result in artesian conditions developing, which would allow contaminated leachate to reach the ground surface.

2.6 Public Health and/or Environmental Risk. Residential areas are located directly to the south and west of the Site. Several homes are located only 25 to 50 feet away to the southwest of the Site.

The Site currently has approximately 2,200 gas collection wells on the two landfills and approximately 12 groundwater/leachate extraction wells. All of the gas collection systems must be maintained and be operational 24 hours per day to prevent releases of hazardous substances from the Site. Releases of methane and vinyl chloride from these systems are of particular concern.

Groundwater/leachate extraction wells must also be operated to prevent migration of landfill leachate from the Site. One extraction well must be operated continuously to prevent artesian conditions from developing, which would result in the release of contaminated leachate.

The onsite LTP must be maintained and kept operational to process liquids coming from the gas collection and leachate extraction wells. Failure to keep the LTP operational will force the shutdown of the wells.

There is a potential for release of hazardous substances to the environment from the landfills if landfill covers deteriorate and allow the escape of waste materials. Air emissions could lead to direct exposure of West Covina residents and release of hazardous substances resulting from cap erosion would potentially result in exposures to workers onsite. A flammable and potentially explosive atmosphere may also develop if methane released from the landfills mixes with ambient air. In addition, failure to maintain storm water runoff systems has resulted in serious onsite erosion problems that may result in hazardous substances being released from the Class I landfill. Failure to maintain the Class I landfill cap and irrigation systems may result in deterioration of the cap to the point that hazardous substances may be released.

Failure to maintain and operate the groundwater/leachate extraction wells and the LTP will result in migration of contaminated leachate from the Site and potential surface releases in an area where artesian conditions exist.

III. CONCLUSIONS OF LAW

3.1 Respondents are responsible parties as defined by Health and Safety Code section 25323.5.

3.2 Each of the substances listed in Section 2.4 is a "hazardous substance" as defined in Health and Safety Code section 25316.

3.3 There has been a "release" and/or there is a "threatened release" of hazardous substances listed in Section 2.4 at the Site, as defined in Health and Safety Code section 25320.

3.4 The actual and threatened release of hazardous substances at the Site may present an imminent and substantial endangerment to the public health or welfare or to the environment.

3.5 Response action is necessary to abate a public nuisance and/or to protect and preserve the public health.

IV. DETERMINATION

4.1 Based on the foregoing findings of fact and conclusions of law, DTSC hereby determines that response action is necessary at the Site because there has been a release and/or there is a threatened release of a hazardous substance.

4.2 Based on the foregoing findings of fact and conclusions of law, DTSC hereby determines that there may be an imminent and/or substantial endangerment to the public health or welfare or to the environment because of the release and/or the threatened release of the hazardous substances at the Site.

V. ORDER

Based on the foregoing FINDINGS, CONCLUSIONS, AND DETERMINATION, IT IS HEREBY ORDERED THAT Respondent(s) conduct the following response actions in the manner specified herein:

5.1 Removal/Response Actions. Respondent shall undertake the following removal actions. DTSC has determined that they are necessary to control or mitigate the hazardous substances at or emanating from the Site.

5.1.1 On or before January 7, 2005, Respondents shall conduct all essential landfill operations and maintenance of the Site outlined in Exhibit B.

5.1.2 On or before February 28, 2005, Respondent(s) shall complete and submit to DTSC an assessment that identifies tasks Respondent(s) determine should be conducted in the near term to adequately operate and maintain the Facility and/or protect public health, safety and the environment. This assessment shall address, but shall not be limited to, the tasks identified in Exhibit C. In conjunction with the assessment, Respondent(s) shall submit to DTSC a work plan and implementation schedule that outlines how and when Respondents will conduct and complete the tasks identified in the assessment and the work plan. The work plan shall include a detailed description of the tasks to be performed, the information or data needed for each task, and the deliverables that will be submitted to DTSC. The implementation schedule shall outline the priority, specific time frames for commencement and completion of each task, and date of report submittal to DTSC. A Quality Assurance Project Plan and Health and Safety Plan developed in accordance with Sections 5.1.6 and 5.1.7 shall be included in the work plan. The work plan shall identify each task to be performed in order of priority based on public health and environmental risk. Respondents shall complete all tasks no later than 240 days after DTSC approval of the work plan.

5.1.3 On or before March 15, 2005, Respondent(s) shall complete and submit to DTSC an assessment of the Facility's storm drain systems. In conjunction with the assessment, Respondent(s) shall submit a work plan and implementation schedule to repair/replace any deteriorated storm drain system components that must be repaired/replaced in the near term to prevent any release or threat of release of hazardous substances that may pose a public health or environmental risk. These components shall include, but not be limited to, the Facility's down drains, storm drain sections and the "north and south haul road" drains that could adversely affect the integrity of the cap or its function. Respondents shall also include in the work plan a

Quality Assurance Project Plan and Health and Safety Plan that has been developed in accordance with Sections 5.1.6 and 5.1.7. This work plan shall be consistent with Chapters 6.5 and 6.8 of the Health and Safety Code. The repairs and replacement shall be completed no later than September 30, 2005. Submittal of this work plan and implementation schedule shall not relieve Respondent(s) of the responsibility to ensure that the activities required by the Los Angeles Regional Water Quality Control Board (LARWQCB) Cleanup and Abatement Order No. R4-2004-0130, issued on September 9, 2004 are conducted.

5.1.4 Respondent(s) shall implement any tasks identified in the work plan and implementation schedule submitted pursuant to Section 5.1.2 above earlier than the dates identified in the schedule approved by DTSC if, subsequent to that approval, DTSC determines that it is necessary to implement certain tasks sooner in order to mitigate the release of hazardous substances at or emanating from the Site. DTSC may require Respondent(s) to submit a work plan that includes a revised schedule for implementing the work plan. Either DTSC or Respondent(s) may identify the need for more rapid implementation and completion of tasks identified in the work plan submitted pursuant to Section 5.1.2. Respondent(s) shall implement the Quality Assurance Plan and Health and Safety Plan developed in conjunction with Section 5.1.2 if Respondent(s) implement any tasks pursuant to this section.

5.1.5 Additional Response Actions. Respondent(s) shall also undertake additional response actions, if during the course of implementing the actions set forth in this Order, DTSC determines that they are necessary to mitigate the release of hazardous substances at or emanating from the Site. Either DTSC or Respondent(s) may identify the need for additional response actions. DTSC may require Respondent(s) to submit a work plan for undertaking the additional response actions that includes a schedule for implementing the work plan for DTSC's approval. Respondent(s) shall include a Quality Assurance Plan and Health and Safety Plan

///

developed in accordance with Sections 5.1.6 and 5.1.7, if Respondent(s) are required to submit a work plan pursuant to this section.

5.1.6 Quality Assurance Plan. The Quality Assurance Plan shall include:

(a) Project organization and responsibilities with respect to sampling and analysis;

(b) Quality assurance objectives for measurement including accuracy, precision, and method detection limits. In selecting analytical methods, Respondent(s) shall consider obtaining detection limits at or below potentially applicable legal requirements or relevant and appropriate standards, such as Maximum Contaminant Levels (MCLs) or Maximum Contaminant Level Goals (MCLGs);

(c) Sampling procedures;

(d) Sample custody procedures and documentation;

(e) Field and laboratory calibration procedures;

(f) Analytical procedures;

(g) Laboratory to be used certified pursuant to Health and Safety Code section 25198;

(h) Specific routine procedures used to assess data (precision, accuracy and completeness) and response actions;

(i) Reporting procedure for measurement of system performance and data quality;

(j) Data management, data reduction, validation and reporting. Information shall be accessible to downloading into DTSC's system; and

(k) Internal quality control.

///

///

///

///

5.1.7 Health and Safety Plan. A site-specific Health and Safety Plan shall be prepared in accordance with federal (29 CFR 1910.120) and State (Cal. Code Regs., tit. 8, § 5192) regulations and shall describe the following:

(a) Field activities including work tasks, objectives, and personnel requirements and a description of hazardous substances on the Site;

(b) Respondent(s) key personnel and responsibilities;

(c) Potential hazards to workers including chemical hazards, physical hazards, confined spaces and climatic conditions;

(d) Potential risks arising from the work being performed including the impact to workers, the community and the environment;

(e) Exposure monitoring plan;

(f) Personal protective equipment and engineering controls;

(g) Site controls including work zones and security measures;

(h) Decontamination procedures;

(i) General safe work practices;

(j) Sanitation facilities;

(k) Standard operating procedures;

(l) Emergency response plan covering workers addressing potential hazardous material releases;

(m) Training requirements;

(n) Medical surveillance program; and

(o) Record keeping.

5.1.8 Respondent(s) shall also implement any other response actions that are identified by Respondent(s), DTSC and/or their representatives as necessary to adequately operate and maintain the Class I landfill, Class III landfill and/or the LTP and/or to protect public health and safety.

5.2 All response actions taken pursuant to this Order shall be consistent with the requirements of Chapters 6.5 (commencing with section 25100) and 6.8

(commencing with section 25300), Division 20 of the Health and Safety Code and any other applicable state or federal statutes and regulations, including the California Code of Regulations, title 22. Either DTSC or Respondent(s) may identify the need for response actions.

5.3 Public Participation Plan (Community Relations). Respondent(s) shall work cooperatively with DTSC in providing an opportunity for meaningful public participation in response actions. Any such public participation activities shall be conducted in accordance with Health and Safety Code sections 25356.1 and 25358.7 and DTSC's most current Public Participation Policy and Guidance Manual, and shall be subject to DTSC's review and approval.

Respondent(s), in coordination with DTSC, shall conduct a baseline community survey and develop a Public Participation Plan (PPP) which describes how, under this Order, the public and adjoining community will be kept informed of activities conducted at the Site and how Respondents will be responding to inquiries from concerned citizens. Major steps in developing a PPP are as follows:

(a) Develop proposed list of interviewees;

(b) Schedule and conduct community interviews; and

(c) Analyze interview notes, and develop objectives.

Respondents shall conduct the baseline community survey and submit the PPP for DTSC's review on or before February 28, 2005.

Respondents shall implement any of the public participation support activities identified in the PPP, at the request of DTSC. DTSC retains the right to implement any of these activities independently. These activities include, but are not limited to, development and distribution of fact sheets; public meeting preparations; and development and placement of public notices.

5.4 California Environmental Quality Act (CEQA). DTSC will comply with CEQA for all activities required by this Order that are projects subject to CEQA. Upon DTSC request, Respondents shall provide DTSC with any information that DTSC

deems necessary to facilitate compliance with CEQA. The costs incurred by DTSC in complying with CEQA are response costs and Respondents shall reimburse DTSC for such costs pursuant to Section 6.19.

5.5 Stop Work Order. In the event that DTSC determines that any activity (whether or not pursued in compliance with this Order) may pose an imminent or substantial endangerment to the health or safety of people on the Site or in the surrounding area or to the environment, DTSC may order Respondents to stop further implementation of this Order for such period of time needed to abate the endangerment. In the event that DTSC determines that any site activities (whether or not pursued in compliance with this Order) are proceeding without DTSC authorization, DTSC may order Respondents to stop further implementation of this Order or activity for such period of time needed to obtain DTSC authorization, if such authorization is appropriate. Any deadline in this Order directly affected by a Stop Work Order, under this Section, shall be extended for the term of the Stop Work Order.

5.6 Emergency Response Action/Notification. In the event of any action or occurrence (such as a fire, earthquake, explosion, or human exposure to hazardous substances caused by the release or threatened release of a hazardous substance) during the course of this Order, Respondents shall immediately take all appropriate action to prevent, abate, or minimize such emergency, release, or immediate threat of release and shall immediately notify the Project Manager. Respondents shall take such action in consultation with the Project Manager and in accordance with all applicable provisions of this Order. Within seven days of the onset of such an event, Respondents shall furnish a report to DTSC, signed by Respondents' Project Coordinator, setting forth the events which occurred and the measures taken in the response thereto. In the event that Respondents fail to take appropriate response and DTSC takes the action instead, Respondents shall be liable to DTSC for all costs of

///

the response action. Nothing in this Section shall be deemed to limit any other notification requirement to which Respondents may be subject.

5.7 Financial Assurance. The Facility is subject to financial assurance requirements for post-closure care of the Class I landfill and closure and post-closure care of the LTP pursuant to Health and Safety Code section 25245 and California Code of Regulations, title 22, sections 66265.140 et seq. and 66264.140 et seq. as applicable. Respondents will also be required to demonstrate financial assurance pursuant to the requirements of Health and Safety Code section 25355.2. All financial assurance mechanisms are subject to the review and approval of DTSC.

## VI. GENERAL PROVISIONS

6.1 Project Coordinator. On or before January 4, 2005, Respondents shall submit to DTSC in writing the name, address, and telephone number of a Project Coordinator whose responsibilities will be to receive all notices, comments, approvals, and other communications from DTSC. Respondents shall promptly notify DTSC of any change in the identity of the Project Coordinator. Respondents shall obtain approval from DTSC before the new Project Coordinator performs any work under this Order.

6.1.1 Communication and Coordination Plan (CCP). On or before January 7, 2005, Respondents shall submit to DTSC for its approval a CCP which specifies the requirements and procedures by which Respondent(s) will communicate and coordinate with one another in carrying out the requirements of this Order.

6.2 Project Engineer/Geologist. The work performed pursuant to this Order shall be under the direction and supervision of a qualified professional engineer or a registered geologist in the State of California, with expertise in hazardous substance site management and post-closure care of landfills. On or before January 7, 2005, Respondent(s) must submit: a) The name and address of the project engineer or geologist chosen by Respondent(s); and b) in order to demonstrate expertise in hazardous substance management and post-closure landfill care, the resumé of the

engineer or geologist, and the statement of qualifications of the consulting firm responsible for the work. Respondent(s) shall promptly notify DTSC of any change in the identity of the Project Engineer/Geologist. Respondent(s) shall obtain approval from DTSC before the new Project Engineer/Geologist performs any work under this Order.

6.3 Monthly Summary Reports. On February 15, 2005, and on a monthly basis thereafter, Respondent(s) shall submit a Monthly Summary Report of its activities under the provisions of this Order. The report shall be received by DTSC by the [15th] day of each month and shall describe:

(a) Specific actions taken by or on behalf of Respondent(s) during the previous calendar month;

(b) Actions expected to be undertaken during the current calendar month;

(c) All planned activities for the next month;

(d) Any requirements under this Order that were not completed;

(e) Any problems or anticipated problems in complying with this Order; and

(f) All results of sample analyses, tests, and other data generated under this Order during the previous calendar month, and any significant findings from these data.

6.4 Quality Assurance/Quality Control (QA/QC). All sampling and analysis, conducted by Respondent(s) under this Order shall be performed in accordance with QA/QC procedures submitted by Respondent(s) and approved by DTSC pursuant to this Order.

6.5 Submittals. All submittals and notifications from Respondent(s) required by this Order shall be sent simultaneously to:

Don Plain, Branch Chief **[three copies]**
Attention: Andy Burrow
Emergency Response and Special Projects Branch
Site Mitigation and Brownfields Reuse Program
Department of Toxic Substances Control
8810 Cal Center Drive
Sacramento, California 95826-3200

With copies to:

Jose Kou, Branch Chief **[two copies]**
Attention: Richard Allen
Southern California Permitting and Corrective Action Branch
Hazardous Waste Management Program
Department of Toxic Substances Control
1011 North Grandview Avenue
Glendale, California 91201-2205

6.6 Communications. All approvals and decisions of DTSC made regarding submittals and notifications will be communicated to Respondent(s) in writing by the Site Mitigation and Brownfields Reuse Program Branch Chief, the Hazardous Waste Management Program Branch Chief, or their designee(s). No informal advice, guidance, suggestions or comments by DTSC regarding reports, plans, specifications, schedules or any other writings by Respondent(s) shall be construed to relieve Respondent(s) of the obligation to obtain such formal approvals as may be required.

6.7 DTSC Review and Approval. (a) All response actions taken pursuant to this Order shall be subject to the approval of DTSC. Respondent(s) shall submit all deliverables required by this Order to DTSC. Once the deliverables are approved by DTSC, they shall be deemed incorporated into, and where applicable, enforceable under this Order.

(b) If DTSC determines that any report, plan, schedule or other document submitted for approval pursuant to this Order fails to comply with this Order or fails to protect public health or safety or the environment, DTSC may:

(1) Modify the document as deemed necessary and approve the document as modified; or

(2) Return comments to Respondent(s) with recommended changes and a date by which Respondent(s) must submit to DTSC a revised document incorporating the recommended changes.

(c) Any modifications, comments or other directives issued pursuant to (a) above, are incorporated into this Order. Any noncompliance with these

///

modifications or directives shall be deemed a failure or refusal to comply with this Order.

6.8 Compliance with Applicable Laws. Nothing in this Order shall relieve Respondent(s) from complying with all other applicable laws and regulations, including but not limited to, compliance with all applicable waste discharge requirements issued by the State Water Resources Control Board or a California Regional Water Quality Control Board. Respondent(s) shall conform all actions required by this Order with all applicable federal, state and local laws and regulations.

6.9 Respondent Liabilities. Nothing in this Order shall constitute or be construed as a satisfaction or release from liability for any conditions or claims arising as a result of past, current or future operations of Respondent(s). Nothing in this Order is intended or shall be construed to limit the rights of any of the parties with respect to claims arising out of or relating to the deposit or disposal at any other location of substances removed from the Site. Nothing in this Order is intended or shall be construed to limit or preclude DTSC from taking any action authorized by law to protect public health or safety or the environment, which may include, but is not limited to, issuance of additional orders and recovering the cost thereof. Notwithstanding compliance with the terms of this Order, Respondent(s) may be required to take further actions as are necessary to protect public health and the environment.

6.10 Site Access. Access to the Site and laboratories used for analyses of samples under this Order shall be provided at all reasonable times to employees, contractors, and consultants of DTSC. Nothing in this Section is intended or shall be construed to limit in any way the right of entry or inspection that DTSC or any other agency may otherwise have by operation of any law. DTSC and its authorized representatives shall have the authority to enter and move freely about all property at the Site at all reasonable times for purposes including, but not limited to: inspecting records, operating logs, sampling and analytic data, and contracts relating to this Site;

reviewing the progress of Respondent(s) in carrying out the terms of this Order; conducting such tests as DTSC may deem necessary; and verifying the data submitted to DTSC by Respondent(s).

To the extent the Site or any other property to which access is required for the implementation of this Order is owned or controlled by persons other than Respondent(s), Respondent(s) shall use best efforts to secure from such persons access for Respondent(s), as well as DTSC, its representatives, and contractors, as necessary to effectuate this Order. To the extent that any portion of the Site is controlled by tenants of Respondent(s), Respondent(s) shall use best efforts to secure from such tenants, access for Respondent(s), as well as for DTSC, its representatives, and contractors, as necessary to effectuate this Order. For purposes of this Section, "best efforts" includes the payment of reasonable sums of money in consideration of access. If any access required to complete the implementation of this Order is not obtained within forty-five (45) days of the effective date of this Order, or within forty-five (45) days of the date DTSC notifies Respondent(s) in writing that additional access beyond that previously secured is necessary, Respondent(s) shall promptly notify DTSC, and shall include in that notification a summary of the steps Respondent(s) has taken to attempt to obtain access. DTSC may, as it deems appropriate, assist Respondent(s) in obtaining access. Respondent(s) shall reimburse DTSC in obtaining access, including, but not limited to, attorneys fees and the amount of just compensation.

6.11 Site Access for Respondents. Respondent BKK, the owner of the portion of the Site that contains the Class I landfill, the Class III landfill and LTP, shall grant access to other Respondents who are in compliance with this Order for the purpose of conducting activities pursuant to this Order or for activities deemed necessary by DTSC to meet the objectives of this Order.

6.12 Sampling, Data and Document Availability. Respondent(s) shall permit DTSC and its authorized representatives to inspect and copy all sampling, testing,

monitoring or other data generated by Respondent(s) or on Respondent(s)' behalf in any way pertaining to work undertaken pursuant to this Order. Respondent(s) shall submit all such data upon the request of DTSC. Copies shall be provided within seven (7) days of receipt of DTSC's written request. Respondent(s) shall inform DTSC at least seven (7) days in advance of all field sampling under this Order, and shall allow DTSC and its authorized representatives to take duplicates of any samples collected by Respondent(s) pursuant to this Order. Respondent(s) shall maintain a central depository at a location approved by DTSC of the data, reports, and other documents prepared pursuant to this Order.

6.13 Record Retention. All such data, reports and other documents shall be preserved by Respondent(s) for a minimum of ten years after the conclusion of all activities under this Order. If DTSC requests that some or all of these documents be preserved for a longer period of time, Respondent(s) shall either comply with that request or deliver the documents to DTSC, or permit DTSC to copy the documents prior to destruction. Respondent(s) shall notify DTSC in writing at least six months prior to destroying any documents prepared pursuant to this Order.

6.14 Government Liabilities. The State of California shall not be liable for any injuries or damages to persons or property resulting from acts or omissions by Respondent(s), or related parties specified in Section 6.24, Parties Bound, in carrying out activities pursuant to this Order, nor shall the State of California be held as party to any contract entered into by Respondent(s) or its agents in carrying out activities pursuant to this Order.

6.15 Additional Actions. By issuance of this Order, DTSC does not waive the right to take any further actions authorized by law.

6.16 Extension Requests. If Respondent(s) is unable to perform any activity or submit any document within the time required under this Order, Respondent(s) may, prior to expiration of the time, request an extension of the time in writing. The

///

extension request shall include a justification for the delay. All such requests shall be in advance of the date on which the activity or document is due.

6.17 Extension Approvals. If DTSC determines that good cause exists for an extension, it will grant the request and specify a new schedule in writing. Respondent(s) shall comply with the new schedule incorporated in this Order.

6.18 Liability for Costs. Respondent(s) is liable for all of DTSC's costs that have been incurred in taking response actions at the Site (including costs of overseeing response actions performed by Respondent(s)) and costs to be incurred in the future.

6.19 Payment of Costs. DTSC will bill Respondent(s) for costs incurred in taking response actions at the Site prior to the effective date of this Order. DTSC will bill Respondent(s) quarterly for its response costs incurred after the effective date of this Order. Respondent(s) shall pay DTSC within sixty (60) days of receipt of any DTSC billing. Any billing not paid within sixty (60) days is subject to interest calculated from the date of the billing pursuant to Health and Safety Code section 25360.1. All payments made by Respondent(s) pursuant to this Order shall be by cashier's or certified check made payable to this "DTSC," and shall bear on the face the project code of the Site (300012) and the Docket number of this Order. Payments shall be sent to:

Department of Toxic Substances Control
Accounting/Cashier
1001 I Street
P.O. Box 806
Sacramento, California 95812-0806

A photocopy of all payment checks shall also be sent to the persons designated by DTSC to receive submittals under this Order.

6.20 Severability. The requirements of this Order are severable, and Respondent(s) shall comply with each and every provision hereof, notwithstanding the effectiveness of any other provision.

///

6.21 Incorporation of Plans, Schedules and Reports. All plans, schedules, reports, specifications and other documents that are submitted by Respondent(s) pursuant to this Order are incorporated in this Order upon DTSC's approval or as modified pursuant to Section 6.7, DTSC Review and Approval, and shall be implemented by Respondent(s). Any noncompliance with the documents incorporated in this Order shall be deemed a failure or refusal to comply with this Order.

6.22 Modifications. DTSC reserves the right to unilaterally modify this Order. Any modification to this Order shall be effective upon the date the modification is signed by DTSC and shall be deemed incorporated in this Order.

6.23 Time Periods. Unless otherwise specified, time periods begin from the effective date of this Order and "days" means calendar days.

6.24 Parties Bound. This Order applies to and is binding upon Respondent(s), and their officers, directors, agents, employees, contractors, consultants, receivers, trustees, successors and assignees, including but not limited to, individuals, partners, and subsidiary and parent corporations. Respondent(s) shall provide a copy of this Order to all contractors, subcontractors, laboratories, and consultants that are retained to conduct any work performed under this Order, on or before January 4, 2005, or the date of retaining their services, whichever is later. Respondent(s) shall condition any such contracts upon satisfactory compliance with this Order. Notwithstanding the terms of any contract, Respondent(s) are responsible for compliance with this Order and for ensuring that its subsidiaries, employees, contractors, consultants, subcontractors, agents and attorneys comply with this Order.

6.25 Change in Ownership. No change in ownership or corporate or partnership status relating to the Site shall in any way alter Respondent(s)' responsibility under this Order. No conveyance of title, easement, or other interest in the Site, or a portion of the Site, shall affect Respondent's obligations under this Order. Unless DTSC agrees that such obligations may be transferred to a third party, Respondent(s) shall be responsible for and liable for any failure to carry out all

activities required of Respondent(s) by the terms and conditions of this Order, regardless of Respondent(s)' use of employees, agents, contractors, or consultants to perform any such tasks. Respondent(s) shall provide a copy of this Order to any subsequent owners or successors before ownership rights or stock or assets in an corporate acquisition are transferred.

VII. NOTICE OF INTENT TO COMPLY

7. On or before December 21, 2004, Respondent(s) shall provide written notice, in accordance with Section 6.5 Submittals of this Order, stating whether or not Respondent(s) will comply with the terms of this Order. If Respondent(s), or any one of them, do not unequivocally commit to perform all of the requirements of this Order, they, or each so refusing, shall be deemed to have violated this Order and to have failed or refused to comply with this Order. Respondent's (s') written notice shall describe, using facts that exist on or prior to the effective date of this Order, any "sufficient cause" defenses asserted by Respondent(s) under Health and Safety Code sections 25358.3(a) and 25355.5(a)(1)(B) or CERCLA section 107(c)(3), 42 U.S.C. section 9607(c)(3).

VIII. EFFECTIVE DATE

8. This Order is final and effective December 9, 2004.

IX. PENALTIES FOR NONCOMPLIANCE

9. Each Respondent may be liable for penalties of up to $25,000 for each day out of compliance with any term or condition set forth in this Order and for punitive damages up to three times the amount of any costs incurred by DTSC as a result of Respondent's(s') failure to comply, pursuant to Health and Safety Code sections 25359, 25359.2, 25359.4, and 25367(c). Health and Safety Code section 25359.4.5 provides that a responsible party who complies with this Order, or with another order

///

///

///

or agreement concerning the same response actions required by this Order, may seek treble damages from Respondent(s) who fail or refuse to comply with this Order without sufficient cause.

DATE: 12/2/04

Barbara Coler

Barbara Coler, Chief
Permitting and Corrective Action Division
Hazardous Waste Management Program
Department of Toxic Substances Control

Attachments

cc: See next page.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

cc: Ms. Arlene Kabei
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Mr. Andrew Pasmant
City Manager
City of West Covina
1444 West Garvey Avenue
West Covina, California 91790

Mr. David Bacharowki
Assistant Executive Officer
California Regional Water Control Board
Los Angeles Region
320 W. 4th Street, Suite 200
Los Angeles, California 90013

Mr. Thomas Heller
Deputy Attorney General
Department of Justice
300 South Spring Street, Suite 500
Los Angeles, California 90013

Ms. Deborah Borzelleri
Legal Office
California Integrated Waste Management Board
P.O. Box 4025
Sacramento, California 95812-4025

Mr. Watson Gin
Deputy Director
Hazardous Waste Management Program
Department of Toxic Substances Control
P.O. Box 806
Sacramento, California 95812-0806

Ms. Dorothy Rice
Deputy Director
Site Mitigation and Brownfields Reuse Program
Department of Toxic Substances Control
P.O. Box 806
Sacramento, California 95812-0806

Mr. Timothy Swickard
Chief Counsel
Office of Legal Counsel and Investigations
Department of Toxic Substances Control
P.O. Box 806
Sacramento, California 95812-0806

///

///

Ms. Marilee Hanson
Senior Staff Counsel
Office of Legal Counsel and Investigations
P.O. Box 806
Sacramento, California 95812-0806

Mr. Donald R. Plain, Chief
Emergency Response and Special Projects Branch
Department of Toxic Substances Control
8810 Cal Center Drive
Sacramento, California 95826-3200

Mr. Jose Kou, Chief
Southern California Permitting and Corrective Action Branch
Department of Toxic Substances Control
1011 North Grandview Avenue
Glendale, California 91201-2205

# EXHIBIT A

# EXHIBIT A
Map of BKK Facility and Surrounding Area



# EXHIBIT B

# EXHIBIT B

The following Facility operations shall be performed in order to protect human health and the environment and avoid damage to the Facility due to operational lapses. These operations shall include:

1. **Class I and Class III Landfills - Gas Collection and Migration Control Systems**

   a) Operate, monitor, and maintain the perimeter and interior gas extraction system, including blowers.

   b) Monitor the landfill gas perimeter probes to ensure gas is not escaping the site boundary.

   c) Operate and maintain gas condensate collection systems.

   These systems shall be operated continuously and shall be operated pursuant to the June 20, 2000, SCAQMD Rule 1150.1 Compliance Plan and any subsequent revisions thereto, the Stipulated Permanent Injunction approved on or about October 28, 1988 (Case No. C507317), the RCRA 3008(h) Orders (Docket Nos. RCRA 09-89-0019 and 09-2000-0003), the Operation Plan for the Class I landfill, applicable provisions of the DTSC final Post-Closure Permit issued on June 30, 2004, and the California Code of Regulations, title 22.

2. **Landfill Gas Combustion System**

   These systems include the onsite Landfill Gas Flare Stations 1 and 2. These systems use flares to burn low BTU value landfill gas (usually from the perimeter gas collection system) and off-gases from the onsite Leachate Treatment Plant (LTP). There is a total of 10 flares, but only five are typically used. Use of flares must be balanced with demand from the cogeneration plant. Actions shall include operation, monitoring, and maintenance of the flare stations and gas lines.

   These systems shall be operated continuously. If the energy recovery systems cease to operate, all collected gases shall be burned at the flare stations. Monitoring and maintenance of this system shall be in accordance with the applicable SCAQMD permits, the June 20, 2000, SCAQMD Rule 1150.1 Compliance Plan and any subsequent revisions thereto; the Operation Plan for the Class I landfill and any amendments thereto, the applicable provisions of the DTSC Post-closure Permit issued June 30, 2004, and the California Code of Regulations, title 22.

3. a) **Class I landfill Clayey/Vegetative Cover/Irrigation System**

These systems shall be operated and maintained to prevent surface emissions of landfill gas and volatile organic compounds (VOCs) into the air, and to prevent infiltration of precipitation into, the trash prism. Required operations include:

1) Regular inspection;

2) Maintain optimum moisture content in the clayey cap;

3) Repair cracks in the clayey cap;

4) Prevent erosion of the clayey cap;

5) Replace eroded cap material;

6) Maintain the vegetative cover to prevent erosion of the clayey cap;

7) Operate the irrigation system (daily); and

8) Maintain the irrigation system.

These operations shall comply with the California Code of Regulations, title 22, the June 20, 2000, SCAQMD Rule 1150.1 Compliance Plan and any subsequent revisions thereto, the Operation Plan for the Class I landfill and any amendments thereto, and applicable provisions of the DTSC final Post-closure Permit issued June 30, 2004.

b) **Landfill Cover Air Monitoring**

Actions shall include the following:

1) Monitor ambient air pursuant to SCAQMD Rule 1150.1.

2) Monitor integrated surface emissions [routed/grid based] pursuant to SCAQMD Rule 1150.1.

3) Monitor instantaneous surface emissions [grid based] pursuant to SCAQMD Rule 1150.1.

4) Monitor vinyl chloride at Nogales End.

This monitoring shall be conducted pursuant to the June 20, 2000 SCAQMD Rule 1150.1 Compliance Plan and any subsequent revisions thereto, applicable provisions of the DTSC final Post-closure Plan for the Class I landfill, and the California Code of Regulations, title 22.

4. **Current Groundwater and Leachate Extraction Systems**

These systems shall be operated, maintained and monitored to minimize further expansion of the existing contaminated groundwater plumes. Operations shall include:

1) Operate, inspect, and maintain Class I leachate extraction sumps, pumps, tanks, and lines to maintain complete collection and unobstructed flow to the LTP.

2) Collect all liquids from remote sumps, tanks, and basins (not piped to the LTP) and transport via vacuum truck to the LTP.

3) Operate, Inspect, and maintain the Class III leachate collection system.

Operations shall comply with the Stipulated Permanent Injunction approved on or about October 28, 1988 (Case No. C50713), the DTSC Operation Plan for the Class I landfill and any subsequent amendments, applicable provisions of the DTSC final Post-Closure Plan issued June 30, 2004, and the California Code of Regulations, title 22.

5. **On-Site Leachate Treatment Plan (LTP)**

The LTP shall be operated continuously. It treats contaminated groundwater and leachate from the Class I and Class III landfills, the collected gas condensate from gas extraction wells (part of the operation and maintenance of the gas collection system), and other liquids. Gases generated in the LTP treatment tanks are piped to the flare stations for combustion. Facility operations shall include:

1) Operate, maintain, and inspect the facility piping, tanks, and mechanical devices.

2) Monitor and effluent to comply with any permit and other regulatory requirements.

3) Properly dispose of all hazardous wastes generated by the treatment plant.

LTP operations shall be in accordance with applicable provisions of permits issued by DTSC, the SCAQMD, and the LARWQCB. Operations shall also comply with the Operation Plans for the LTP and the Class I landfill and the California Code of Regulations, title 22.

6. **Groundwater Extraction System**

Approximately nine (9) to twelve (12) groundwater extraction wells are currently operated and shall continue to be operated at Barriers 1 and 2. Two (2) wells are inactive. Required actions include:

1) Operate, inspect, and maintain Class I groundwater extraction, sumps, pumps, tanks, and lines to maintain complete collection and unobstructed flow to the LTP.

2) Operate, inspect, and maintain all other groundwater pumps, piping, and other equipment to maintain unobstructed flow to the LTP.

This system includes the Miranda Springs Groundwater Pumping Well (Well MR-01) which is continuously pumped to prevent groundwater contaminated with vinyl chloride from manifesting as an artesian spring.

Operations shall comply with the Stipulated Permanent Injunction approved on or about October 28, 1988 (Case No. C507317), the Operation Plan for the Class I landfill and any subsequent amendments, applicable provisions of the DTSC final Post-closure Permit issued June 30, 2004, and the California Code of Regulations, title 22.

7. **Site Maintenance**

The following site maintenance operations shall be provided to support other critical operations. At a minimum, the following shall be maintained:

a) Site access roads.

b) Surface water run-on and run-off control systems.

c) Storm drains to the extent feasible. Specifically repair "north haul road" drain and "south haul road" drains to avoid backup, overflow, and cap damage.

Site maintenance shall be provided in accordance with the DTSC Operation Plan for the Class I landfill and any amendments thereto, applicable provisions of the DTSC final Post-closure Permit issued on June 30, 2004, and the California Code of Regulations, titles 22 and 27.

8. **Site-Wide Security**

Twenty-four (24) hour security service shall be provided to control access to the landfills and surrounding property and to ensure trespassing and vandalism does not occur. These operations shall include:

a) Periodic inspection and repair (as needed) of the perimeter fence;

b) Inspection and maintenance of security devices such as locks, lights, inspection tags, and alarms;

c) Periodic inspection and monitoring of specific locations, equipment, and facilities;

d) The security service must cover the entire Facility including the Class I landfill, the Class III landfill, the LTP, and the cogeneration plant.

e) Secure waste manifests and other information about waste/hazardous substances disposed at the landfills and generators. These documents and other information are currently maintained in the storage building.

Security shall be provided in accordance with the DTSC Operation Plan for the Class I landfill and any amendments thereto, applicable provisions of the DTSC final Post-closure Permit issued on June 30, 2004, the California Code of Regulations, title 22, the closure and post-closure plans for the Class III landfill and the California Code of Regulations, title 27.

9. **Groundwater Monitoring Well Network**

Approximately 180 groundwater wells shall be monitored for water levels at the site on a regular basis. Operations of this network shall include:

1) Sampling and analysis of the wells as specified by the LARWQCB and DTSC.

2) Rehabilitate monitoring wells recently buried or damaged by grading for development of City of West Covina parcels.

The requirements for sampling and analysis are specified in the LARWQCB Monitoring and Reporting Requirements for the Class III landfill (includes the Class I landfill groundwater monitoring network). Monitoring should be conducted pursuant to the DTSC Operation Plan for the Class I landfill and any subsequent amendments, applicable provisions of the DTSC final Post-closure

Permit issued June 30, 2004, any applicable requirements of the U.S. EPA 3008(h) Orders (Docket Nos. RCRA 09-89-0019 & 09-2000-0003), and the California Code of Regulations, title 22.

10. **Inactive Class III Landfill Cover and Irrigation System**

This is the municipal solid waste landfill currently undergoing final closure. As with the closed Class I landfill, certain operations must be conducted and shall include:

a) Maintain the cover.

b) Operate (daily) and maintain the irrigation system.

The irrigation system shall be operated and maintained to protect the Class III landfill cover and shall comply with the California Code of Regulations, title 27, the CIWMB Final Closure and Post-closure Plans for the Class III landfill and SCAQMD Rule 1150.1 requirements

c) In the event that closure activities cease for the Class III landfill before it is officially closed, employ dust suppression methods and place a cover over the Class III landfill that limits infiltration. If infiltration is not limited, the volume of leachate in the leachate system would increase and may compromise its treatment capacity. Methods should also be employed to minimize erosion and ensure adequate drainage.

11. **Reporting to Agencies**

Respondent(s) shall conduct required reporting to all agencies with jurisdiction at the Site, including, but not limited to, DTSC, LARWQCB, SCAQMD, CIWMB, the City of West Covina (the Local Enforcement Agency, LEA), for monitoring or other activities required by these agencies. Reporting shall be conducted in accordance with schedules, conditions and requirements of the respective agencies.

# EXHIBIT C

# EXHIBIT C

1. **Flare Station Repairs and Replacement**

The BKK Facility has two (2) landfill gas flare stations. These stations consist of nine (9) electric driven 100+ hp. blowers, ten (10) flares, instrumentation to monitor and control the stations, air compressors, valves and numerous other types of mechanical equipment. BKK has reported that much of the equipment is in need of immediate repair, preventative maintenance and/ or replacement.

2. **Improve Upper Drainage Basin**

BKK has reported that the improvement of the upper storm water detention basin is required for proper retention and de-silting of rainfall run-off waters from the Class I and Class III landfills. BKK reports this work generally consists of the following:

a. Excavation of approximately 50,000 cubic yards of soil.
b. Repair of 84" storm drain inlets to the basin.
c. Replacement of existing outlet piping and spillway from the basin.
d. Installation of rip rap rock along western earthen wall of the basin.
e. Construction of concrete inlet structure.

3. **LTP Clarifier Cleaning Unit**

The clarifier is a tank-type unit within the leachate treatment plant (LTP) that mechanically removes solid waste particles from the treated effluent that the LTP produces. BKK has reported that the clarifier is approximately 18 years old and now needs to be rebuilt and recoated inside the plant. During the rebuilding of the unit, a rental unit will be required to continue to operate the Facility.

4. **One Million Gallon Water Tank Maintenance**

The one million gallon city water storage tank, owned by BKK and located on the Facility, is primarily used for Class I landfill irrigation. The tank also accepts treated effluent water from the onsite leachate treatment plant. This water is mixed with city water at an approximate eight or ten to one dilution factor to meet LARWQCB discharge requirements *for* use as irrigation water for the Class I landfills vegetative pallet. BKK has reported that the tank is currently in need of internal sand blasting and new internal epoxy paint coating.

5. **Well Modifications on Parcels 1, 2 and Lot 5**

BKK has reported that there are approximately 111 landfill gas, liquid monitoring, and gas monitoring probes that will require decommissioning, relocation and/ or protection in place during Class III landfill closure.

6. **Facility Fence**

The perimeter fencing of the Facility will require repair and/or replacement of various sections.

7. **Secondary Containment for North Haul Road Sump Number 1**

There is an eight foot diameter by sixty-five feet deep fiberglass sump located adjacent to the Class I landfill north haul road. This sump collects and pumps contaminated liquids from the landfill base. The sump is a double wall/double containment unit. The regulations require that some type of monitoring equipment be installed to alert landfill personnel if a leak occurs within the sump double wall containment system.

8. **Landfill Gas System Replacement and Repairs**

The Class I landfill gas system consists of over fifty (50) miles of PVC pipelines, approximately 2,500 landfill gas wells with wellheads, six-condensate collection sumps, three landfill gas blowers, and many other types of equipment and parts. Over the next three-year period (2004 thru 2006), many parts of the system will require maintenance and replacement. Replacement and repair work consists of, but is not limited to, drilling new gas wells, purchase and replacement of leachate extraction pumps, replacement of the main gas line flex boot.

9. **Irrigation System Replacement**

The Class I landfill irrigation system consisting of primarily steel pipe in need of repair. There are miles of irrigation pipeline and many sections of this pipe are rusting through. When this happens, the system shuts down and the potential for cap damage is increased. This damage can occur in couple of ways. The first is that the cap can dry out and crack, creating gas emissions. The second is that if a large diameter pipe ruptures, the clay cap in that area can be severely eroded away. If erosion takes place, the cap repairs will be significant and extensive.

10. **Reconfigure North Haul Road Sump System**

This sump should be removed from service, decontaminated, and disposed of. The piping and liquids which were directed to this sump must then be redirected to north haul road sump number one. The elimination of sump number two will save on annual repairs, inspections, and future agency oversight.