# EXHIBIT D

1  EDMUND G. BROWN JR. Attorney General                          JS-6
   of the State of California
2  J. MATTHEW RODRIQUEZ
   Chief Assistant Attorney General
3  KEN ALEX
   Senior Assistant Attorney General
4  JAMES POTTER Cal Bar No. 166992
   OLIVIA W. KARLIN, Cal. Bar No. 105432
5  Deputy Attorneys General
   300 South Spring Street, Suite 1702
6  Los Angeles, CA 90013
   Telephone: (213) 897-2638
7  Fax:        (213) 897-2802

8  Attorneys for Plaintiffs

9

10                 UNITED STATES DISTRICT COURT

11                CENTRAL DISTRICT OF CALIFORNIA

12

13  CALIFORNIA DEPARTMENT OF          No. CV10-03378-CAS(AWJx)
    TOXIC SUBSTANCES CONTROL and
14  the CALIFORNIA TOXIC              SECOND CONSENT DECREE
    SUBSTANCES CONTROL ACCOUNT,
15
                  Plaintiffs,
16
            v.
17
    AMERICAN HONDA MOTOR CO.,
18  INC.; ANADARKO E&P COMPANY
    LP; ATLANTIC RICHFIELD
19  COMPANY; BAYER CROPSCIENCE
    INC.; THE BOEING COMPANY;
20  CHEMICAL WASTE MANAGEMENT,
    INC.; CHEVRON ENVIRONMENTAL
21  MANAGEMENT COMPANY; CITY OF
    LOS ANGELES, ACTING BY AND
22  THROUGH THE LOS ANGELES
    DEPARTMENT OF WATER AND
23  POWER; CONOCOPHILLIPS
    COMPANY; THE DOW CHEMICAL
24  COMPANY; DUCOMMUN
    AEROSTRUCTURES, INC.; EXXON
25  MOBIL CORPORATION; GEMINI
    INDUSTRIES, INC.; GENERAL LATEX
26  AND CHEMICAL CORPORATION;
    HONEYWELL INTERNATIONAL INC.;
27  HUNTINGTON BEACH COMPANY;
    LOCKHEED MARTIN CORPORATION;
28  MCFARLAND ENERGY, INC.

                        1

A/73055612.2

1  MORTON INTERNATIONAL, INC.;
   NATIONAL STEEL AND
2  SHIPBUILDING COMPANY;
   NORTHROP GRUMMAN
3  CORPORATION; QUEMETCO, INC.;
   RAYTHEON COMPANY; ROHR, INC.;
4  ROHM AND HAAS COMPANY;
   SHELL OIL COMPANY; SOUTHERN
5  CALIFORNIA EDISON COMPANY;
   THUMS LONG BEACH COMPANY;
6  UNION CARBIDE CORPORATION;
   UNION OIL COMPANY OF
7  CALIFORNIA; WASTE
   MANAGEMENT COLLECTION AND
8  RECYCLING, INC.; WESTERN WASTE
   INDUSTRIES; and XEROX
9  CORPORATION,

10              Defendants.

11

12                     SECOND CONSENT DECREE

13      This Second Consent Decree is made and entered into by and among the

14  Plaintiffs and the Settling Defendants, as defined in Paragraphs 3.11, 3.13 and 3.14

15  herein (collectively, the "Parties"). This Second Consent Decree obligates the

16  Settling Defendants to continue to perform certain ongoing work at the Subject

17  Property, as defined herein, to perform certain additional work and to pay certain

18  costs, as specified herein. This Second Consent Decree also resolves the liability of

19  the Settling Defendants for certain costs incurred and to be incurred by the Plaintiff

20  Department of Toxic Substances Control ("DTSC") and for the performance of

21  certain work at the Facility, as defined herein. This Second Consent Decree does

22  not affect in any way the Parties' claims against any persons or entities other than

23  those bound by this Second Consent Decree (as defined in Paragraph 10.21), nor

24  does it resolve any claims against or liabilities of the parties bound unless expressly

25  addressed in this Second Consent Decree.

26                         INTRODUCTION

27      On March 9, 2006, the Court entered an Amended Consent Decree ("Amended

28  First Consent Decree"), which settled without further litigation the complaint that

                                    2

A/73055612.2

1   Plaintiff DTSC previously filed against the Settling Defendants (except The Boeing

2   Company, The Dow Chemical Company, Gemini Industries, Inc., General Latex

3   and Chemical Corporation, Lockheed Martin Corporation, Morton International,

4   Inc., Raytheon Company, Rohm and Haas Company, which have been added as

5   Settling Defendants in this Second Consent Decree) for recovery of Past Response

6   Costs as defined therein and the performance of certain injunctive relief pursuant to

7   Section 107 of the Comprehensive Environmental Response, Compensation and

8   Liability Act of 1980, 42 U.S.C. § 9607, as amended ("CERCLA"), and California

9   Health and Safety Code Section 25358.3(e) in connection with alleged releases of

10  hazardous substances into the environment at and from a closed hazardous waste

11  landfill in West Covina, California, as described herein ("Complaint").  The

12  Amended First Consent Decree became effective on March 9, 2006 for a two-year

13  term, has been extended seven times, and will expire on April 12, 2010, unless

14  further extended.  Settling Defendants The Boeing Company, The Dow Chemical

15  Company, Gemini Industries, Inc., General Latex and Chemical Corporation,

16  Lockheed Martin Corporation, Morton International, Inc., Raytheon Company, and

17  Rohm and Haas Company were not parties to the Amended First Consent Decree.

18      In light of the upcoming expiration of the Amended First Consent Decree, the

19  Parties are now lodging this Second Consent Decree with the Court and have

20  concurrently filed a new complaint ("Second Complaint").  Like the previous

21  Complaint, the Second Complaint seeks recovery of Past Response Costs as defined

22  herein and the performance of certain injunctive relief pursuant to Section 107 of

23  CERCLA, and California Health and Safety Code Section 25358.3(e), in

24  connection with alleged releases of hazardous substances into the environment at

25  and from the closed hazardous waste landfill in West Covina, California.  Similarly,

26  like the Amended First Consent Decree, this Second Consent Decree requires the

27  performance of work to maintain conditions at the Subject Property and the

28  payment of certain costs.  In addition, this Second Consent Decree provides for the

3

1    performance of additional work to evaluate removal actions to address conditions at

2    the Subject Property. Unless explicitly stated otherwise herein, this Second

3    Consent Decree does not amend the First Amended Consent Decree. Subject to the

4    covenants, conditions and reservations of rights in this Second Consent Decree, the

5    Second Consent Decree resolves the claims asserted in the Second Complaint.

6        Plaintiffs and Settling Defendants agree, and this Court by entering this

7    Second Consent Decree finds, that the Second Consent Decree has been negotiated

8    by the Parties in good faith and that settlement of this matter and entry of the

9    Second Consent Decree is intended to avoid prolonged and complicated litigation

10   between the Parties, is the most appropriate means to continue to address conditions

11   at the Subject Property, and is fair, reasonable and in the public interest.

12       **NOW, THEREFORE**, with the consent of the Parties to this Second Consent

13   Decree, it is hereby **ORDERED, ADJUDGED AND DECREED**:

14   I.    JURISDICTION

15       1.1    This Second Consent Decree is entered into by the Parties pursuant to

16   the Plaintiffs' authority under Section 107 of CERCLA, 42 U.S.C. § 9607, and

17   California Health and Safety Code Section 25358.3(e). The Court has jurisdiction

18   over the subject matter of this action pursuant to 28 U.S.C. Section 1331 and

19   CERCLA, 42 U.S.C. Sections 9601 *et seq*., and supplemental jurisdiction over

20   claims arising under the laws of the State of California pursuant to 28 U.S.C.

21   Section 1367(a). The Parties waive all objections and defenses they may have to

22   the jurisdiction of the Court to approve, enter, and enforce this Second Consent

23   Decree and to venue in this District.

24   II.   BACKGROUND

25       2.1    This Second Consent Decree relates to a 583-acre landfill facility

26   located at 2210 South Azusa Avenue, West Covina, Los Angeles County,

27   California 91792. The Facility (as defined in Paragraph 3.6 herein) contains a

28   closed Class I hazardous waste landfill, a closed Class III municipal landfill and

A/73055612.2

1    related facilities. A map and a legal description of the 583-acre Facility are

2    attached as Exhibits A-1 and A-2, respectively. Non-party BKK Corporation

3    ("BKK") owns the portion of the Facility that is commonly described as Parcel 3,

4    which includes the Class I and Class III landfills. Non-party City of West Covina

5    owns the balance of the 583-acre property, which is commonly described as Parcels

6    1 and 2.

7        2.2    <u>Regulatory Status</u>. On Parcel 3, BKK is the owner and operator of the

8    following: (a) the closed Class I Landfill; (b) the closed Class III landfill; (c) an

9    operating leachate treatment plant; and (d) the inactive "Area D" disposal area.

10   Post-closure operation, maintenance and monitoring of the Class I Landfill, and

11   operation of the LTP, are primarily regulated by DTSC pursuant to the California

12   Health and Safety Code and the California Code of Regulations, Title 22.

13       2.3    On October 18 and 20, 2004, BKK notified DTSC that for financial

14   reasons BKK would no longer be able to perform required post-closure care of the

15   Class I Landfill, or operate the LTP, after November 17, 2004. As a result, DTSC

16   hired a contractor to conduct emergency response activities at the Facility

17   beginning on November 18, 2004. These activities were and continue to be

18   necessary to ensure continuous maintenance and operation of systems that are

19   essential to protect public health, safety and the environment.

20       2.4    On December 2, 2004, DTSC issued an Imminent and Substantial

21   Endangerment Determination and Order and Remedial Action Order Docket No.

22   I/SE-D-04/05-004 ("ISE Order"), to BKK and 50 other respondents who are alleged

23   to have disposed of waste at the Class I Landfill or to be prior owners or operators

24   of the Facility that includes the Class I Landfill. The ISE Order required the

25   respondents to that Order to perform certain response actions and to reimburse

26   DTSC for certain response costs. All of the Settling Defendants, except

27   ConocoPhillips Company, Northrop Grumman Corporation, Waste Management

28

5

1  Collection and Recycling, Inc, Huntington Beach Company, McFarland Energy,

2  Inc., and Union Carbide Corporation are named as respondents in the ISE Order.

3  2.5  The payment of Future Oversight Costs relating to the performance

4  and oversight of the work performed pursuant to this Second Consent Decree by the

5  Settling Defendants to DTSC constitute necessary costs of response as that term is

6  defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

7  2.6  The Amended First Consent Decree provides, among other things for

8  the performance of essential activities at the Subject Property (as defined in

9  Paragraph 3.15 herein), and for the reimbursement of certain DTSC response costs

10  with respect to the Facility, covenants not to sue, contribution protection, standstill

11  agreements and a tolling agreement with respect to enforcement activity and

12  litigation among the parties to that agreement concerning the Facility, to enable

13  those parties to work collaboratively to identify additional entities to participate in

14  the performance, and/or funding of activities at the Subject Property and to work

15  towards a long-term program to address conditions at the Subject Property.  The

16  Amended First Consent Decree terminates on April 12, 2010, unless further

17  extended.

18  2.7  Pursuant to the Second Consent Decree, the Settling Defendants will

19  continue to perform the essential activities, pay for certain costs, evaluate

20  conditions and potential removal actions at the Subject Property, and receive certain

21  covenants and protections as set forth herein.

22  2.8  No Admissions.  By entering into this Second Consent Decree or by

23  taking any action in accordance with its provisions, each Settling Defendant does

24  not admit any allegations, findings, determinations or conclusions contained in the

25  ISE Order, the Complaint, the Amended First Consent Decree or this Second

26  Consent Decree, including without limitation that it sent, transported or arranged

27  for disposal of any hazardous substances to or at the Class I Landfill, or that it

28  owned or operated the Facility that includes the Class I Landfill, and does not admit

6

A/73055612.2

1  any liability with respect to the Facility.  Nothing in this Second Consent Decree

2  shall be construed as an admission by any Settling Defendant of any issue of law or

3  fact.  Except as specifically provided for herein, nothing in this Second Consent

4  Decree shall prejudice, waive, or impair any right, remedy, or defense that each

5  Settling Defendant may have against any entity.  Each Settling Defendant agrees to

6  comply with and be bound by the terms of this Second Consent Decree and further

7  agrees that it will not contest the basis or validity of this Second Consent Decree in

8  any action to enforce it.

9  III.  DEFINITIONS

10  3.1  Unless otherwise expressly provided herein, terms used in this Consent

11  Decree that are defined in CERCLA or in regulations promulgated under CERCLA

12  shall have the meaning assigned to them therein.  Whenever terms listed below are

13  used in this Second Consent Decree or in any attachments or exhibits hereto, the

14  following definitions shall apply:

15  3.2  "Class I Landfill" means the closed hazardous waste landfill located at

16  2210 South Azusa Avenue, West Covina, Los Angeles County, California 91792

17  that is shown on the map that is attached as Exhibit A-1.  Together, the Class I

18  Landfill and the Leachate Treatment Plant are also referred to in this Consent

19  Decree as part of the "Subject Property."

20  3.3  "Class III Landfill" shall mean that municipal landfill also located at

21  2210 South Azusa Avenue, West Covina, Los Angeles County, California 91792,

22  which is shown on the map in Exhibit A-1.

23  3.4  "Day" shall mean a calendar day unless expressly stated to be a

24  working day.  "Working Day" shall mean a day other than a Saturday, Sunday, or

25  Federal holiday.  In computing any period of time under this Second Consent

26  Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday,

27  the period shall run until the close of business of the next Working Day.

28

7

1      3.5   "Effective Date" shall mean the date that this Second Consent Decree

2  is entered by the Court.

3      3.6   "Facility" shall mean the 583-acre landfill facility located at 2210

4  South Azusa Avenue, West Covina, California and described in Exhibits A-1 and

5  A-2. The Facility contains a closed Class I hazardous waste landfill, a closed Class

6  III municipal landfill, the Leachate Treatment Plant as defined herein, and related

7  facilities. For purposes of Paragraphs 2.8, 3.12, 7.5, 7.6, 7.7, 7.10, 7.11 and 8.5,

8  Facility shall also include contiguous areas to the Facility where hazardous

9  substances emanating from the Landfills have come to be located.

10      3.7   "Future DTSC Oversight Costs" shall mean all direct and indirect

11  costs of overseeing  this Second Consent Decree, including but not limited to

12  payroll costs, travel costs, and laboratory costs, incurred by DTSC in reviewing,

13  revising, modifying, commenting on or approving plans, reports and other items

14  pursuant to this Second Consent Decree, and monitoring and verifying the Work

15  performed during the term of this Second Consent Decree.

16      3.8   "Hazardous Substances" shall have the meaning set forth in CERCLA

17  Section 101(14), 42 U.S.C. § 9601(14).

18      3.9   "Leachate Treatment Plant" (or "LTP") means the leachate treatment

19  plant that is located on the Class I Landfill.  Together, the Class I Landfill and the

20  LTP are also referred to in this Second Consent Decree as part of the "Subject

21  Property."

22      3.10   "National Contingency Plan" or "NCP" shall refer to the National Oil

23  and Hazardous Substances Pollution Contingency Plan promulgated pursuant to

24  Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300.

25      3.11   "Parties" shall mean Plaintiffs and the Settling Defendants.

26      3.12   "Past Response Costs" shall mean all direct and indirect costs,

27  including interest thereon, incurred by the Plaintiff with respect to the Facility at

28

8

1    anytime between the lodging of the Amended First Consent Decree and up to and
2    including the date of lodging of this Second Consent Decree.

3        3.13  "Plaintiffs" or "DTSC" shall mean the California Department of Toxic
4    Substances Control and the following state accounts, to the extent that funds from
5    those accounts have been, or will be expended on behalf of DTSC at the Facility:

6            (a)    The California Hazardous Substance Account;

7            (b)    The California Hazardous Waste Control Account;

8            (c)    The California Toxic Substances Control Account; and

9            (d)    The California Site Remediation Account.

10       3.14  "Settling Defendants" shall mean the parties identified as Defendants
11   in the caption above.  For purposes of Paragraph 2.8, Section VII, and Section VIII,
12   "Settling Defendants" also shall mean Defendants' corporate predecessors-in-
13   interest, successors-in-interest and affiliated companies identified in Exhibit G.

14       3.15  "Subject Property" shall mean the Class I Landfill, the LTP, service
15   roads and related pollution control equipment located at 2210 South Azusa Avenue,
16   West Covina, Los Angeles County, California 91792.

17       3.16  "Tolling Termination Date" shall mean the date upon which the
18   Tolling Agreement provided for in Paragraph 7.11 terminates.  The Tolling
19   Termination Date shall be the earlier of: (a) sixty (60) days after a Party gives
20   written notice of the intent to terminate the tolling period or (b) the expiration of the
21   Term of this Second Consent Decree.

22       3.17  "Term of the Second Consent Decree" shall mean the period of time
23   commencing with the Effective Date and ending three years later.  The Parties may
24   extend this term pursuant to Paragraph 9.4 herein.

25       3.18  "Work" shall mean the Work to be Performed specified in Paragraph
26   4.1 of this Second Consent Decree.

27

28

9

IV.  **SETTLING DEFENDANTS' WORK TO BE PERFORMED AND OTHER OBLIGATIONS**

4.1  <u>Work to Be Performed</u>. Settling Defendants shall undertake the following response actions set forth below.

4.1.1  <u>Essential Activities</u>. No later than thirty (30) days after the date of lodging of this Second Consent Decree, Settling Defendants shall submit to DTSC any amendments to the Quality Assurance Project Plan and Health and Safety Plan submitted pursuant to Paragraph 4.1.1 of the Amended First Consent Decree to reflect any new and/or expanded activities as described in this Second Consent Decree. Settling Defendants shall continue the Essential Activities described in Exhibit C. Settling Defendants shall perform this work for the term of the Second Consent Decree.

4.1.2  <u>Engineering Evaluation/Cost Analysis and Scope of Work</u>. The Settling Defendants shall conduct an Engineering Evaluation/Cost Analysis in accordance with the Scope of Work attached to this Second Consent Decree as Exhibit D.

4.1.3  <u>Work Consistent with Requirements</u>. Subject to Paragraph 4.6 herein, all Work performed pursuant to this Second Consent Decree shall be consistent with the requirements of all DTSC-approved workplans, Chapter 6.5 (commencing with Section 25100) and Chapter 6.8 (commencing with Section 25300), Division 20 of the California Health and Safety Code, and any other applicable state or federal statutes and regulations, including without limitation, the NCP, and applicable DTSC and U.S. Environmental Protection Agency guidance documents.

4.1.4  To the extent that there is a conflict between the language in any Exhibit and the terms of this Second Consent Decree, the terms of this Second Consent Decree shall control.

10

1      4.1.5  Upon approval by DTSC of the work performed by Settling

2  Defendants under this Second Consent Decree and on receipt by DTSC of all

3  payments required to be made pursuant to this Second Consent Decree, said work

4  will be deemed consistent and in accordance with the NCP.

5      4.1.6  <u>Public Participation Activities (Community Relations)</u>.  Settling

6  Defendants shall cooperate with and support DTSC in its efforts to provide

7  meaningful public participation in response actions pursuant to California Health

8  and Safety Code Sections 25356.1 and 25358.7, DTSC's most current Public

9  Participation and Policy Guidance Manual and the Public Participation Plan.  These

10  activities shall include, but are not limited to, assisting in the development and

11  distribution of fact sheets; public meetings; and the development and publishing of

12  public notices.

13      4.2  <u>California Environmental Quality Act</u>.  Upon DTSC request, Settling

14  Defendants shall submit any non-privileged information deemed necessary by

15  DTSC to facilitate DTSC's compliance with the California Environmental Quality

16  Act, California Public Resources Code sections 21000 *et seq.*

17      4.3  <u>Stop Work Order</u>.  In the event that DTSC determines that any activity

18  (whether or not pursued in compliance with this Second Consent Decree) conducted

19  by Settling Defendants may pose an imminent or substantial endangerment to the

20  health or safety of people or to the environment, DTSC may order Settling

21  Defendants to stop further implementation of this Second Consent Decree for such

22  period of time needed to abate the endangerment.  In addition, in the event that

23  DTSC determines that any of Settling Defendants' activities (whether or not

24  pursued in compliance with this Second Consent Decree) is proceeding without

25  DTSC authorization, DTSC may order Settling Defendants to stop further

26  implementation of such activity for such period of time needed to obtain DTSC

27  authorization, if such authorization is appropriate.  Any deadline in this Second

28

11

1  Consent Decree directly affected by a Stop Work Order, issued pursuant to this

2  Paragraph, shall be extended for the term of the Stop Work Order.

3      4.4    <u>Emergency Response Action/Notification</u>. In the event of any

4  occurrence, event, or condition that arises at the Subject Property during the Term

5  of the Second Consent Decree, that constitutes a material change, that represents an

6  emergency (including, but not limited to, fire, earthquake, explosion, landslide, or

7  imminent or immediate human exposure to a hazardous substance caused by the

8  release or threatened release of a hazardous substance) and that presents a risk to

9  public health, and safety or the environment, Settling Defendants shall immediately

10  take all appropriate actions to respond to that emergency. The Settling Defendants

11  shall also immediately notify the DTSC Project Coordinator (as defined in

12  Paragraph 10.1 herein) and, all other appropriate and applicable regulatory agencies

13  of the occurrence, event, or condition and of the steps the Settling Defendants have

14  taken and propose to take in response thereto. The Settling Defendants shall comply

15  with any mandatory notification requirements and with the procedures outlined in

16  the Emergency Response Plan and Diagrams that the Settling Defendants submitted

17  to DTSC on or about November 21, 2008 or any subsequent version of those

18  documents submitted to and approved by DTSC. Any action taken by the Settling

19  Defendants shall be performed in consultation with the DTSC Project Coordinator

20  and in accordance with all applicable provisions of the Second Consent Decree.

21  Within seven (7) days of the onset of such an occurrence, event, or condition,

22  Settling Defendants shall furnish a report to DTSC, signed by Settling Defendants'

23  Project Coordinator, setting forth the occurrence, event, or condition that occurred

24  and the measures taken in the response thereto. In the event that Settling

25  Defendants fail to take appropriate response and DTSC takes the action instead,

26  Settling Defendants shall be subject to liability to DTSC for all costs of the

27  response action. In addition, the Settling Defendants shall notify the DTSC Project

28  Coordinator verbally within forty-eight (48) hours and in writing within seven (7)

A/73055612.2

1   days of any release of a hazardous substance at the Subject Property. Nothing in

2   this Paragraph shall be deemed to limit any other notification requirement to which

3   Settling Defendants may be subject, nor any defenses that the Settling Defendants

4   may have with respect to any action brought by DTSC to recover the costs of the

5   response action taken by it pursuant to this Paragraph.

6       4.5   Settling Defendants' Insurance. At least seven (7) days prior to

7   commencement of any work under the Second Consent Decree, Settling Defendants

8   shall provide copies of insurance policies or other evidence satisfactory to DTSC

9   that demonstrates that any contractor or subcontractor hired by the Settling

10  Defendants to implement the Work pursuant to the Second Consent Decree

11  maintains in force during the Term of the Second Consent Decree insurance

12  equivalent to the following:

13          (a)   commercial general liability insurance with a combined single

14  limit of at least $1 million per occurrence;

15          (b)   automotive liability insurance with combined single limits of at

16  least $2 million per accident;

17          (c)   workers' compensation and employers' liability coverage of at

18  least $1 million for employees engaged in the implementation of this Consent

19  Decree;

20          (d)   pollution liability insurance with a combined single limit of at

21  least $1 million per occurrence; and

22          (e)   excess/umbrella liability coverage in the aggregate amount of

23  $10 million.

24      4.6   Owner/Operator Status. The Plaintiffs agree, and by entering this

25  Consent Decree the Court finds, that the Settling Defendants shall not be

26  considered owners or operators of the Facility, or arrangers for disposal or

27  treatment of waste at the Facility solely as a result of their performance of the Work

28  under this Consent Decree. BKK is the current owner and operator of the Subject

1 Property and operator of the Facility. Nothing in this Consent Decree shall relieve
2 BKK of its statutory and regulatory obligations as the owner/operator of the Subject
3 Property and operator of the Facility, or require Settling Defendants to assume
4 those obligations, including compliance with all applicable laws and permits with
5 respect to the landfills, signing manifests for waste generated at the LTP, public
6 notices under California Health and Safety Code Sections 25249.5-25249.13 and
7 other reporting obligations that are the responsibility of BKK as the owner and
8 operator of the Subject Property, and operator of the Facility.
9       4.7    Payment of Future DTSC Oversight Costs.
10              4.7.1  The Settling Defendants shall reimburse DTSC for Future
11 DTSC Oversight Costs incurred after the Effective Date of this Second Consent
12 Decree to oversee the activities of Settling Defendants and their agents under the
13 Second Consent Decree, in the sum of $50,000 per month during the term of the
14 Second Consent Decree.  Such payments shall begin thirty (30) days after the
15 Effective Date of the Second Consent Decree and each subsequent payment shall be
16 made on the 15th of each month thereafter.  In the event that the payments required
17 by this Paragraph are not made on a timely or complete basis, Settling Defendants
18 shall pay interest on the unpaid balance, calculated at the rate of return earned on
19 investment in the Surplus Money Investment Fund pursuant to Section 16475 of the
20 California Government Code. The interest shall accrue from the date the payment
21 was due, through the date of Settling Defendants' payment. Payments of interest
22 under this Paragraph shall be in addition to such other remedies or sanctions
23 available to Plaintiffs by virtue of Settling Defendants' failure to make timely
24 payments under this Section. Settling Defendants shall make all payments required
25 by the Second Consent Decree in the manner described in Paragraph 10.16.
26              4.7.2  Documentation of Future DTSC Oversight Costs. DTSC shall
27 continue to provide Settling Defendants with a Summary by Activity Report on a
28 quarterly basis, documenting the Future DTSC Oversight Costs that have been

14

1    incurred by DTSC.  In the event that DTSC incurred less than $50,000 per month in

2    Future DTSC Oversight Costs during the previous quarter, Settling Defendants

3    shall receive a credit for any overpayment against future payments to be made

4    pursuant to Paragraph 4.7.1, 1 or, if there are no future payments to be made,

5    against Past Response Costs.

6    V.     AGREEMENTS BY DTSC

7        5.1    Postclosure Insurance Reimbursement.

8         5.1.1  For purposes of California Code of Regulations, Title 22,

9    Sections 66264.145 and 66265.145, DTSC authorizes Settling Defendants to

10   perform certain postclosure care of the Class I Landfill by conducting the Work that

11   is related to postclosure care of the Class I Landfill during the Term of the Second

12   Consent Decree.  As persons authorized to perform postclosure care of the Class I

13   Landfill, Settling Defendants shall be entitled to submit a claim for reimbursement

14   of costs incurred in performing the work pursuant to Section IV herein and

15   Appendices C and D from Steadfast Insurance Company Policy No. PLC 7969053-

16   04 for postclosure care expenditures by submitting itemized bills to DTSC pursuant

17   to California Code of Regulations, Title 22, Sections 66264.145(e) and

18   66265.145(d) as applicable and Exhibit F of the Second Consent Decree. Settling

19   Defendants shall submit the reimbursement request at the close of each annual

20   coverage cycle (May 31) and shall submit only one reimbursement request for each

21   reimbursement cycle during the period covered by this Second Consent Decree.

22   Provided that Settling Defendants perform the work specified in this Second

23   Consent Decree for a full reimbursement cycle, they shall be entitled to the entire

24   insurance proceeds for that reimbursement cycle (approximately $1,340,000) minus

25   up to $120,000 on a first priority basis.  Where the term of this Second Consent

26   Decree partially overlaps with an annual insurance reimbursement cycle, the

27   Settling Defendants shall be entitled on a first priority basis to a monthly pro-rata

28   share of an amount equal to the entire insurance proceeds for that reimbursement

15

1   cycle minus up to $120,000 based on the duration of work performed by the

2   Settling Defendants pursuant to this Consent Decree.  Settling Defendants shall be

3   entitled to those costs associated with the performance of work pursuant to

4   Paragraph 4.1 herein, and which qualify for reimbursement under California Code

5   of Regulations, Title 22, Sections 66264.145 or 66265.145 as applicable.  After

6   Settling Defendants submit their request, DTSC agrees to review each

7   reimbursement request within sixty (60) days of submission and, pursuant to the

8   California Code of Regulations, Title 22, Sections 66264.145 (e) or 66265.145 (d)

9   as applicable, approve the reimbursement request if it meets the requirements of the

10  regulations and the costs are eligible postclosure expenditures.  Exhibit F provides

11  the protocol for submittal of said requests for reimbursement.

12          5.1.2  If all or part of the remaining $120,000 of the insurance

13  proceeds (per reimbursement cycle) is not approved for reimbursement to BKK by

14  DTSC, such proceeds shall be made available to reimburse the Settling Defendants

15  pursuant to the terms of Paragraph 5.1.1.

16          5.1.3  DTSC shall not be liable for any denial of reimbursement by

17  Steadfast Insurance Company or its successor or by a court.  DTSC agrees to

18  provide non-privileged information in its possession to the Settling Defendants

19  necessary for securing reimbursement from Steadfast as authorized pursuant to

20  Paragraph 5.1.

21      5.2     Site Coordination.  DTSC and the Settling Defendants agree to work

22  with each other and all other relevant entities to achieve a coordinated approach for

23  all of the activities to be conducted at the Facility during the term of the Second

24  Consent Decree.

25  VI.     DUE CARE/COOPERATION

26      6.1     Subject to Paragraph 4.6 above, the Settling Defendants shall exercise

27  due care in performing work under the Second Consent Decree, and shall perform

28  the work required by the Second Consent Decree in compliance with all applicable

16

A/73055612.2

1     local, state, and federal laws and regulations. Nothing in this Paragraph shall be

2     deemed to (a) relieve BKK of the obligation to comply with any local, state, and

3     federal laws and regulations applicable to it or permits issued to it with respect to

4     the Subject Property or the Class III Landfill, or (b) require Settling Defendants to

5     perform the obligations of BKK as owner and operator of the Facility to comply

6     with any such laws, regulations or permits.

7     VII.    <u>COVENANTS NOT TO SUE AND RESERVATIONS OF RIGHTS</u>

8         7.1    <u>DTSC's Covenant Not to Sue.</u> In consideration of the actions that will

9     be performed and the payments that have been and will be made by Settling

10    Defendants under the terms of the Second Consent Decree and subject to

11    Paragraph 7.6 (DTSC's Reservation of Rights) of the Second Consent Decree,

12    DTSC covenants not to sue or take administrative action against Settling

13    Defendants: (a) for the Work performed pursuant to the Second Consent Decree;

14    (b) for $5 million in Past Response Costs, as defined in Paragraph 3.12 herein,

15    incurred by DTSC and for any Past Response Costs incurred by DTSC in excess of

16    $8.5 million. The $5 million in Past Response Costs (and Past Response Costs in

17    excess of $8.5 million) subject to this Paragraph shall not include costs for which

18    DTSC provided a covenant not to sue in the Amended First Consent Decree, or past

19    costs for which DTSC has been reimbursed by third parties, except to the extent

20    that such  reimbursement is applied by DTSC to reimburse DTSC for the costs

21    subject to the covenant not to sue in the Amended First Consent Decree; and (c) for

22    recovery of Future DTSC Oversight Costs paid to DTSC by the Settling Defendants

23    pursuant to Paragraph 4.7 above.

24         7.2    Nothing in the Second Consent Decree shall preclude DTSC from

25    seeking the recovery of any response cost not recovered under the Second Consent

26    Decree from any entity not a party to the Second Consent Decree.

27         7.3    Nothing in the Second Consent Decree shall preclude DTSC from

28    seeking recovery of any response costs from the Settling Defendants incurred after

17

1   the termination of the Second Consent Decree or not otherwise included in the

2   Covenant Not to Sue in Paragraph 7.1 above or in Paragraph 7.1 of the Amended

3   First Consent Decree.

4        7.4    The Covenant Not to Sue set forth in Paragraph 7.1 above shall take

5   effect upon the Effective Date of the Second Consent Decree. This Covenant Not

6   to Sue is conditioned upon the complete and satisfactory performance by Settling

7   Defendants of all obligations under this Second Consent Decree, including, but not

8   limited to, performance of the Work pursuant to Paragraph 4.1, and full payment of

9   Future DTSC Oversight Costs. This covenant not to sue extends only to Settling

10   Defendants and does not extend to any other person or entity.

11        7.5    DTSC's Standstill. DTSC agrees not to take any additional

12   administrative or judicial actions against the Settling Defendants with respect to the

13   Facility until the earlier of: (a) fourteen (14) days after the date upon which a

14   complaint (not including the complaint filed concurrently with the lodging of this

15   Second Consent Decree) is served on any Party requiring the performance of work,

16   reimbursement of response costs, or contribution towards response costs incurred

17   for the Facility; (b) fourteen (14) days following written notice from either DTSC

18   or the Settling Defendants of that Party's intent to terminate the standstill; or (c)

19   thirty (30) days before the Tolling Termination Date. This Paragraph does not limit

20   DTSC's reserved rights under Paragraph 7.6(a) below.

21        7.6    DTSC's Reservation of Rights. The Covenant Not to Sue set forth in

22   Paragraph 7.1 above does not pertain to any matters other than those expressly

23   specified therein. DTSC reserves and this Second Consent Decree is without

24   prejudice to all rights against Settling Defendants with respect to all other matters,

25   including but not limited to, the following:

26        (a)    claims based on a failure by Settling Defendants and their

27   successors or assignees to meet a requirement of or to otherwise enforce the Second

28   Consent Decree;

A/73055612.2

1         (b)    criminal liability;

2         (c)    liability for damages for injury to, destruction of, or loss of

3 natural resources, and for the costs of any natural resource damage assessment

4 incurred by agencies;

5         (d)    except as may otherwise be provided for herein, liability for

6 violations of local, state or federal law or regulations;

7         (e)    liability for any response actions at the Facility not otherwise

8 included in Paragraph 7.1 above; including, without limitation, implementation of

9 any removal action recommended by the Engineering Evaluation/Cost Analysis,

10 any investigation of groundwater contamination associated with the Subject

11 Property, any response action to limit, mitigate or control groundwater

12 contamination associated with the Subject Property, any investigation of soil gas

13 migration outside the Subject Property, conduct of any Remedial

14 Investigation/Feasibility Study at the Facility, or any remedial action at the Facility;

15         (f)    liability for DTSC response costs other than those specifically

16 included in Paragraph 7.1 of this Second Consent Decree or in Paragraph 7.1 of the

17 Amended First Consent Decree;

18         (g)    except as may otherwise be provided for herein, any liability

19 arising from past, present or future ownership, operation, disposal, release, or threat

20 of release of hazardous substances, pollutants or contaminants, at other sites besides

21 the Facility;

22         (h)    except as may otherwise be provided for herein, liability based

23 upon the Settling Defendants' ownership or operation of the Facility, or upon the

24 Settling Defendants' transportation, treatment, storage, or disposal, or the

25 arrangement for the transportation, treatment, storage, or disposal of any hazardous

26 substances, pollutants or contaminants at or in connection with the Facility.

27     7.7    Except as provided in the Second Consent Decree, nothing herein shall

28 limit the power and authority of DTSC or any other State agency to take, direct, or

A/73055612.2

1   order all actions necessary to protect public health, welfare, or the environment or

2   to prevent, abate, or minimize an actual or threatened release of hazardous

3   substances, pollutants or contaminants, or hazardous or solid waste on, at, or from

4   the Facility including the right to issue any administrative order against the Settling

5   Defendants with respect to the Facility not otherwise inconsistent with the terms of

6   this Second Consent Decree. Further, except as specifically provided for in the

7   Second Consent Decree, nothing herein shall prevent DTSC from seeking legal or

8   equitable relief to enforce the terms of the Second Consent Decree, from taking

9   other legal or equitable actions as it deems appropriate and necessary, or from

10  requiring the Settling Defendants to perform additional activities after the

11  termination of the Second Consent Decree pursuant to CERCLA, the California

12  Health and Safety Code, the California Code of Regulations, Title 22, or any other

13  applicable law.

14      7.8     Settling Defendants' Covenant Not To Sue. In consideration of

15  DTSC's Covenant Not To Sue in Paragraph 7.1 of the Second Consent Decree, the

16  Settling Defendants hereby covenant not to sue and not to assert any claims or

17  causes of action against DTSC, its authorized officers or employees, based on any

18  regulatory action undertaken by DTSC with respect to the Subject Property from

19  January 1, 2004 through the term of this Second Consent Decree. Nothing in this

20  Paragraph precludes the Settling Defendants from pursuing any such claim based

21  on regulatory action undertaken by DTSC during any other period.

22      7.9     Settling Defendants' Reservation of Rights. The Covenant Not To Sue

23  set forth in Paragraph 7.8 and the Standstill Agreement set forth in Paragraph 7.10

24  do not pertain to any matters other than those specifically addressed therein and

25  apply only to DTSC and do not extend to any other department, agency, board or

26  body of the State of California. The Settling Defendants reserve, and the Second

27  Consent Decree is without prejudice to, all rights against DTSC with respect to all

28  other matters.

20

A/73055612.2

7.10   Settling Defendants' Standstill.  The Settling Defendants agree not to take any judicial actions against DTSC with respect to the Facility until the earlier of: (a) fourteen (14) days after the date upon which a complaint (not including the complaint filed concurrently with the lodging of this Second Consent Decree) is served on any Party requiring the performance of work, reimbursement of response costs, or contribution towards response costs incurred for the Facility; (b) fourteen (14) days following written notice from either DTSC or the Settling Defendants of that Party's intent to terminate the standstill; or (c) thirty (30) days before the Tolling Termination Date.

7.11   Tolling Agreement.  DTSC and Settling Defendants agree that all statutes of limitations and any other statute, law, rule or principle of equity of similar effect applicable to any rights, claims, causes of action, counterclaims, cross-claims and defenses with respect to the Facility that Settling Defendants could assert against DTSC, or that DTSC could assert against the Settling Defendants, as of the Effective Date shall be tolled for the period between the Effective Date of the Amended First Consent Decree and the Tolling Termination Date, and this tolling period shall be excluded from all computations of any applicable period of limitations.  Such potentially applicable statutes of limitations that are tolled by this agreement include, without limitation, any applicable time limits within which an action may be commenced against DTSC under the provisions of the California Government Claims Act, California Government Code Sections 900-960.8.

VIII.   EFFECT OF SETTLEMENT/ CONTRIBUTION PROTECTION

8.1   With regard to claims for contribution against Settling Defendants, the Parties hereto agree, and by entering the Second Consent Decree the Court finds, upon entry of the Second Consent Decree, that the Settling Defendants are entitled to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2) for matters addressed in the Second Consent Decree.  The matters addressed in the Second Consent Decree are (a) the Work

21

A/73055612.2

1   described herein, to the extent that such work is actually performed by or on behalf

2   of Settling Defendants and approved by DTSC; (b) the Past Response Costs

3   included in DTSC's Covenant Not to Sue at Paragraph 7.1. herein; and (c) Future

4   DTSC Oversight Costs as defined in this Second Consent Decree that are paid

5   pursuant to Paragraph 4.7. The matters addressed in this Second Consent Decree

6   do not include the items specified in paragraph 7.6(e) of the DTSC's Reservations

7   of Rights herein.

8        8.2    Nothing in the Second Consent Decree shall be construed to create any

9   rights in, or grant any cause of action to, any person not a party to this Second

10  Consent Decree with respect to the Facility. Each of the Parties to this Second

11  Consent Decree expressly reserves, and the Second Consent Decree is without

12  prejudice to, all rights (including, but not limited to, any right to contribution,

13  indemnification and/or reimbursement), defenses, claims, remedies, demands, and

14  causes of action that each party may have with respect to any matter, transaction, or

15  occurrence relating in any way to the Facility against any person not a party hereto.

16       8.3    The Settling Defendants agree that with respect to any suit or claim for

17  contribution brought by them for matters related to this Second Consent Decree --

18  excluding any claim made against any California State entity -- they will notify

19  DTSC in writing at least sixty (60) days prior to the initiation of any such suit or

20  claim.

21       8.4    The Settling Defendants also agree that with respect to any suit or

22  claim for contribution brought against them for matters related to the Second

23  Consent Decree, they will notify in writing DTSC within ten (10) days of service of

24  the complaint on them. In addition, Settling Defendants shall notify DTSC within

25  ten (10) days of service or receipt of any Motion for Summary Judgment and within

26  ten (10) days of receipt of any order from a court setting a case for trial.

27       8.5    DTSC agrees that with respect to any suit or claim for contribution

28  brought against it for matters related to the Second Consent Decree, it will notify

22

A/73055612.2

1   the Settling Defendants in writing within ten (10) days of service of the complaint

2   on it. In addition, DTSC shall notify the Settling Defendants within ten (10) days

3   of service or receipt of any Motion for Summary Judgment and within ten (10) days

4   of receipt of any order from a court setting a case for trial.

5        8.6   In any subsequent administrative or judicial proceeding initiated by

6   one or more of the Plaintiffs for injunctive relief, recovery of response costs, or

7   other appropriate relief relating to the Facility, Settling Defendants shall not assert,

8   and may not maintain, any defense or claim based upon the principles of waiver, res

9   judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses

10   based upon any contention that the claims raised by DTSC in the subsequent

11   proceeding were or should have been brought in the instant case.

12   IX.   FUTURE COOPERATION

13        9.1   The Parties recognize that the Settling Defendants represent a subset of

14   those who may be responsible for response actions at the Subject Property. The

15   Parties also recognize that the Amended First Consent Decree and the Second

16   Consent Decree represent interim steps towards more permanent solutions to the

17   long term operation and maintenance of the Subject Property that may include

18   components for additional responsible parties. The Parties agree to work in good

19   faith towards this long term solution.

20        9.2   Additional Potentially Responsible Parties (PRPs).

21        (a)   DTSC has issued notices of noncompliance to respondents to the

22   ISE Order who are not Parties to the Second Consent Decree. DTSC has issued

23   notice letters to approximately 255 entities they believe to be additional potentially

24   responsible parties. The Settling Defendants issued notice letters to additional

25   potentially responsible parties including agencies of the State of California other

26   than DTSC.

27        (b)   If the Settling Defendants provide evidence and supporting

28   documentation to DTSC in accordance with California Health and Safety Code

A/73055612.2

1     section 25356.1.3 concerning the potential liability of any other person with respect

2     to the Facility, then DTSC will evaluate the information accordingly and take such

3     actions as deemed appropriate in DTSC's sole discretion. These actions may

4     include, but are not limited to, notice letters, information requests, issuing final

5     determinations of non-compliance with the ISE Order, and judicial and

6     administrative enforcement actions, or no action.

7          (c)     DTSC shall work in good faith to provide the Settling

8     Defendants with reasonable access to those BKK documents under DTSC control

9     concerning waste disposal at the Facility.

10          (d)     DTSC and the Settling Defendants shall work together in good

11     faith in addressing settlement issues with respect to other potentially responsible

12     parties at the Facility. Nothing in this Consent Decree shall prohibit any Party from

13     bringing any action regarding the Facility against any entity not a Party to this

14     Consent Decree or settle any such action on any terms consistent with law.

15     9.3     At least one year prior to the termination date of the Second Consent

16     Decree, the Settling Defendants shall provide written notice to DTSC of their intent

17     to commence negotiations on a settlement agreement that will supersede the Second

18     Consent Decree.

19     9.4     The Parties may, by mutual written agreement, and with approval of

20     the Court, extend some or all of the obligations and related provisions of the

21     Second Consent Decree.

22     9.5     Settling Defendants shall inform DTSC at least six (6) months before

23     the date the obligations of the Second Consent Decree terminate whether they

24     intend to extend the Second Consent Decree.

25     X.     <u>GENERAL PROVISIONS</u>

26     10.1    <u>Project Coordinators</u>. Settling Defendants' Project Coordinator is

27     Roberto Puga, P.G. of Project Navigator, Ltd. Settling Defendants shall promptly

28     notify DTSC in writing at least seven (7) working days before any proposed change

24

1   in the identity of the Project Coordinator. Settling Defendants shall obtain approval

2   from DTSC before the new Project Coordinator performs any work under the

3   Second Consent Decree. DTSC's Project Coordinator is Dan Ziarkowski, Chief,

4   BKK Unit, Legacy Landfill & RCRA Corrective Action Office   DTSC's Project

5   Coordinator will be responsible for overseeing Settling Defendants' implementation

6   of the Second Consent Decree.

7           10.1.1 Each Project Coordinator shall be responsible for designating a

8   person to act in her/his absence. All communications between DTSC and Settling

9   Defendants concerning the Work shall be directed through the Project Coordinators.

10          10.2   Project Engineer/Geologist. The Work performed pursuant to the

11  Second Consent Decree shall be under the direction and supervision of a qualified

12  professional engineer or a professional geologist in the State of California, with

13  expertise in hazardous substance site management and post-closure care of landfills.

14  On January 21, 2005, the Settling Defendants provided the name, address,

15  telephone number and resume of Mr. Roberto Puga, P.G. to serve as interim Project

16  Geologist along with the statement of qualifications of Mr. Puga's firm, Project

17  Navigator, Ltd. Within seven (7) days of the Effective Date of the Second Consent

18  Decree, Settling Defendants shall submit supplemental resumes and/or statements

19  of qualifications as appropriate. Settling Defendants shall promptly notify DTSC in

20  writing at least seven (7) working days before any proposed change in the identity

21  of the Project Engineer/Geologist. Settling Defendants shall obtain approval from

22  DTSC before the new Project Engineer/Geologist performs any work under the

23  Second Consent Decree.

24          10.3   Monthly Summary Reports. After the end of the first month after the

25  Effective Date of the Second Consent Decree, Settling Defendants shall submit to

26  DTSC a Monthly Summary Report of their activities under the provisions of the

27  Second Consent Decree. The reports shall be received by DTSC by the 15th day of

28  each month and shall describe:

A/73055612.2

1      (a)    Specific actions taken by or on behalf of Settling Defendants

2  during the previous calendar month;

3      (b)    Actions expected to be undertaken during the current calendar

4  month;

5      (c)    All planned activities for the next calendar month;

6      (d)    Any problems or anticipated problems in complying with the

7  Second Consent Decree; and

8      (e)    All results of sample analyses, tests, and other data generated

9  under the Second Consent Decree during the previous calendar month, and any

10  significant findings from these data.

11      10.4   Quality Assurance/Quality Control. All sampling and analysis

12  conducted by Settling Defendants under the Second Consent Decree shall be

13  performed in accordance with Quality Assurance/Quality Control procedures

14  submitted by Settling Defendants and approved by DTSC pursuant to the Amended

15  First Consent Decree or this Second Consent Decree.

16      10.5   Submittals. Each submittal and notification from Settling Defendants

17  required by the Second Consent Decree shall both (a) be submitted electronically to

18  DTSC in accordance with California Health and Safety Code Section 57013 and

19  any regulations or policies DTSC has adopted pursuant thereto and (b) shall be sent

20  simultaneously in triplicate copy to:

21          Dan Zarkowski, Chief
            BKK Unit, Legacy Landfill & RCRA Corrective Action Office
22          Attention: Andy Burrow
            Department of Toxic Substances Control
23          8810 Cal Center Drive
            Sacramento, California  95826-3200
24

25

26      10.6   Communications. All approvals and decisions of DTSC made

27  regarding submittals and notifications will be communicated to Settling Defendants

28  in writing by the DTSC Project Coordinator or his/her designee. No informal

26

A/73055612.2

advice, guidance, suggestions or comments by DTSC regarding reports, plans, specifications, schedules or any other writings by Settling Defendants shall be construed to relieve Settling Defendants of their obligation to obtain such formal approvals as may be required by the Second Consent Decree.

10.7   DTSC Review and Approval.

10.7.1 All response actions taken pursuant to the Second Consent Decree shall be subject to the approval of DTSC.  Settling Defendants shall submit all deliverables required by the Second Consent Decree to DTSC.  DTSC shall revise and approve or reject the deliverables within 45 days of its receipt thereof. Once the deliverables are approved by DTSC, they shall be deemed incorporated into, and where applicable, enforceable under the Second Consent Decree.

10.7.2 If DTSC determines that any report, plan, schedule or other document submitted for approval pursuant to the Second Consent Decree fails to comply with the Second Consent Decree, subject to Settling Defendants' right to invoke dispute resolutions pursuant to the Second Consent Decree, DTSC may:

(a)   Modify the document as deemed necessary and approve the document as modified; or

(b)   Return comments to Settling Defendants with recommended changes and a date by which Settling Defendants must submit to DTSC a revised document incorporating the recommended changes.

10.8   Access for DTSC/Access to Property Owned by Others.

10.8.1 DTSC has entered into the Right to Enter Agreement with BKK, which requires BKK to provide full access to Parcel 3 to DTSC and its consultants, contractors and designees.

10.8.2 For purposes of gaining access to the Facility, the Settling Defendants are deemed DTSC's designees.

10.8.3 Settling Defendants shall cooperate with DTSC to provide DTSC with access to the Subject Property consistent with applicable health and

27

1   safety plans, laws and regulations.  Settling Defendants shall provide access to data

2   and facilitate access to laboratories used for analyses of the samples obtained

3   pursuant to the Second Consent Decree at all reasonable times to employees,

4   contractors, and consultants of DTSC.  Nothing in this Paragraph is intended or

5   shall be construed to limit in any way the right of entry or inspection that DTSC or

6   any other agency may otherwise have by operation of any law.

7           10.8.4  The Settling Defendants shall also cooperate with DTSC to

8   provide access to any other person not a party to the Second Consent Decree as

9   directed by DTSC subject to applicable health and safety plans, laws and

10  regulations.  DTSC shall work with Settling Defendants to assure that all activities

11  at the Subject Property are coordinated.

12          10.8.5  For property other than Parcel 3 to which access is required for

13  the implementation of the Second Consent Decree and which is owned or

14  controlled by persons other than Settling Defendants, Settling Defendants shall use

15  best efforts to secure from such persons access for Settling Defendants, as well as

16  DTSC, its representatives, and contractors, as necessary to effectuate the Second

17  Consent Decree.  For purposes of this Paragraph, "best efforts" shall include the

18  payment of reasonable sums of money in consideration for access.

19          10.8.6  If any access required to complete the Work is not obtained,

20  Settling Defendants shall promptly notify DTSC and shall include in that

21  notification a summary of the steps Settling Defendants have taken to gain access.

22  DTSC may, as it deems appropriate, assist Settling Defendants in obtaining access.

23  Settling Defendants shall be subject to liability for costs incurred by DTSC in

24  obtaining access.

25      10.9   Sampling, Data and Document Availability.  Settling Defendants shall

26  permit DTSC and its authorized representatives to inspect and copy all sampling,

27  testing, monitoring or other data generated by Settling Defendants or on Settling

28  Defendants' behalf pursuant to the Second Consent Decree.  Settling Defendants

28

A/73055612.2

1   shall submit all such data upon the request of DTSC.  Copies shall be provided

2   within seven (7) days of receipt of DTSC's written request.  Settling Defendants

3   shall inform DTSC at least seven (7) days in advance of all field sampling under the

4   Second Consent Decree, and shall allow DTSC and its authorized representatives to

5   take duplicates of any samples collected by Settling Defendants pursuant to the

6   Second Consent Decree.  DTSC shall have the right to take any additional samples

7   that DTSC deems necessary. Upon request, DTSC shall allow Respondents to take

8   split or duplicate samples of any samples DTSC takes as part of its oversight of

9   Respondents' implementation of the Work.  Settling Defendants shall maintain a

10  central depository of the data, reports, and other documents prepared pursuant to

11  the Second Consent Decree.

12      10.10   <u>Work Takeover</u>.  In the event DTSC determines that Settling

13  Defendants have ceased implementation of any portion of the Work, are seriously

14  or repeatedly deficient or late in their performance of the Work, or are

15  implementing the Work in a manner which may cause an endangerment to human

16  health or the environment, DTSC may assume the performance of all or any portion

17  of the Work as DTSC determines necessary. Respondents may invoke the

18  procedures set forth in Section XIV (Dispute Resolution) to dispute DTSC's

19  determination that takeover of the Work is warranted under this Paragraph. Costs

20  incurred by DTSC in performing the Work pursuant to this Paragraph shall be

21  considered response costs and shall be within the reservation of rights of Paragraph

22  7.6 of this Consent Decree.  Notwithstanding any other provision of this Second

23  Consent Decree, DTSC retains all authority and reserves all rights to take any and

24  all response actions authorized by law.

25      10.11 <u>Record Retention</u>.  All such data, reports and other documents shall be

26  preserved by Settling Defendants for a minimum of ten (10) years after the

27  conclusion of all activities under this Consent Decree.  If DTSC requests that some

28  or all of these documents be preserved for a longer period of time, Settling

1  Defendants shall either comply with that request or deliver the documents to DTSC,

2  or permit DTSC to copy the documents prior to destruction. Settling Defendants

3  shall notify DTSC in writing, at least six (6) months prior to destroying any

4  documents prepared pursuant to the Second Consent Decree.

5      10.12 <u>Government Liabilities</u>. The State of California shall not be liable for

6  any injuries or damages to persons or property resulting from acts or omissions by

7  Settling Defendants, or related parties specified in Paragraph 10.21 (Parties Bound),

8  in carrying out activities pursuant to the Second Consent Decree, nor shall the State

9  of California be held as party to any contract entered into by Settling Defendants or

10 its agents in carrying out activities pursuant to the Second Consent Decree.

11     10.13 <u>Extension Requests</u>. If Settling Defendants are unable to perform any

12 activity or submit any document within the time required under the Second Consent

13 Decree, Settling Defendants may, prior to expiration of the time, request an

14 extension of the time in writing. The extension request shall include a justification

15 for the delay. All such requests shall be in advance of the date on which the

16 activity or document is due.

17     10.14 <u>Extension Approvals</u>. If DTSC determines that good cause exists for

18 an extension, it will grant the request and specify a new schedule in writing.

19 Settling Defendants shall comply with the new schedule incorporated in the Second

20 Consent Decree.

21     10.15 <u>Recoverable Costs</u>. The Parties agree, and by entering the Second

22 Consent Decree the Court finds, that all payments made to DTSC for Future DTSC

23 Oversight Costs pursuant to the Second Consent Decree have been or are being

24 made to reimburse DTSC for recoverable response costs as defined under CERCLA

25 and the California Hazardous Substances Account Act, California Health and

26 Safety Code Sections 25300, *et seq*., incurred by DTSC with respect to releases or

27 threatened releases of hazardous substances at the Facility in a manner that was and

28 is consistent with the NCP.

1        10.16 <u>Payments</u>. All payments made by the Settling Defendants pursuant to

2    the Second Consent Decree shall be made by a cashier's or certified check made

3    payable to the "Department of Toxic Substances Control", and bearing on its face

4    the project code for the Facility (Site # 300012-00) and the docket number of the

5    Second Consent Decree. On each check, Settling Defendants shall state: "For

6    BKK Costs." On each check, payments shall be further identified as either "BKK

7    DTSC Oversight Costs" or "DTSC Response Costs" and shall be sent to:

8
9                Department of Toxic Substances Control
                  Accounting Office
10               1001 I Street, 21st floor
                  P. O. Box 806
11               Sacramento, California 95812-0806

12

13       A photocopy of the check shall be sent concurrently to DTSC's Project

14    Coordinator.

15        10.17 <u>Severability</u>. The requirements of the Second Consent Decree are

16    severable, and Settling Defendants shall comply with each and every provision

17    hereof, notwithstanding the effectiveness of any other provision.

18        10.18 <u>Incorporation of Plans, Schedules and Reports</u>. All plans, schedules,

19    reports, specifications and other documents that are submitted by Settling

20    Defendants pursuant to the Second Consent Decree are incorporated in the Second

21    Consent Decree upon DTSC's approval or as modified pursuant to Paragraph10.7,

22    DTSC Review and Approval, and shall be implemented by Settling Defendants.

23    Any noncompliance with the documents incorporated in the Second Consent

24    Decree shall be deemed a failure or refusal to comply with the Second Consent

25    Decree.

26        10.19 <u>Modifications</u>. The Second Consent Decree may only be modified in

27    writing by mutual agreement by the Parties and approval of the Court.

28

A/73055612.2

1       10.20 <u>Time Periods</u>. Unless otherwise specified, time periods begin from the

2  Effective Date of the Second Consent Decree.

3       10.21 <u>Parties Bound</u>. The Second Consent Decree applies to and is binding

4  upon DTSC and its successors-in-interest and the Settling Defendants, and their

5  corporate predecessors-in-interest successors-in-interest and affiliated companies

6  identified in Exhibit G. Settling Defendants shall provide a copy of the Second

7  Consent Decree to all contractors, subcontractors, laboratories, and consultants that

8  are retained to conduct any work performed under this Consent Decree, within

9  fifteen (15) days after (a) the Effective Date of the Second Consent Decree, or (b)

10  the date of retaining their services, whichever is later. Settling Defendants shall

11  condition any such contracts upon satisfactory compliance with the Second Consent

12  Decree. Notwithstanding the terms of any contract, Settling Defendants are

13  responsible for compliance with this Second Consent Decree and for ensuring that

14  their successors-in-interest, affiliated companies identified in Exhibit G, employees,

15  contractors, consultants, subcontractors, agents and attorneys comply with the

16  Second Consent Decree.

17       10.22 <u>Joint and Several Obligations</u>. The obligations of the Settling

18  Defendants to carry out all activities and to make the payments required by the

19  Second Consent Decree are joint and several. In the event of failure of any one or

20  more Settling Defendants to conduct the Work pursuant to the Second Consent

21  Decree and/or to make the payments required under the Second Consent Decree,

22  the remaining Settling Defendants shall be responsible for such Work and for such

23  payments. In the event of the insolvency or other failure of any one or more

24  Settling Defendants to implement the requirements of the Second Consent Decree,

25  the remaining Settling Defendants shall complete all of the requirements.

26       10.23 <u>Change in Ownership</u>. No change in ownership or corporate or

27  partnership status relating to the Subject Property shall in any way alter Settling

28  Defendants' responsibility under this Consent Decree. No conveyance of title,

A/73055612.2

1  easement, or other interest in the Subject Property, or a portion of the Subject

2  Property, shall affect Settling Defendants' obligations under the Second Consent

3  Decree. Unless DTSC agrees that such obligations may be transferred to a third

4  party, Settling Defendants shall be responsible for and liable for any failure to carry

5  out all activities required of Settling Defendants by the terms and conditions of the

6  Second Consent Decree, regardless of Settling Defendants' use of employees,

7  agents, contractors, or consultants to perform any such tasks. Settling Defendants

8  shall provide a copy of the Second Consent Decree to any subsequent owners or

9  successors before ownership rights or stock or assets in a corporate acquisition are

10 transferred.

11 XI.  DELAY IN PERFORMANCE/STIPULATED PENALTIES

12      11.1  For each day that the Settling Defendants fail to deliver a deliverable

13 in a timely manner, fail to perform work of acceptable quality, or otherwise fail to

14 perform the work required by the Second Consent Decree, including Exhibits C and

15 D, Settling Defendants shall be liable for stipulated penalties as set forth below.

16 Penalties begin to accrue on the day that the deliverable or performance is due, and

17 continue to accrue until one of the following occurs: (a) DTSC notifies Settling

18 Defendants that it will conduct the work; or (b) Settling Defendants submit the

19 deliverable or perform the work in question and DTSC determines that the

20 document or work is acceptable to DTSC (whichever is earlier). Payment of any

21 Stipulated Penalties by Settling Defendants shall be due within thirty (30) days of

22 receipt of a demand letter from DTSC.

23      11.1.1 For the following deliverables or work, stipulated penalties shall

24 accrue in the amount of $500.00 per day, per violation, for the first seven (7) days

25 of noncompliance, and $750.00 per day, per violation thereafter:

26      (a)    Monthly reports as required by Paragraph 10.3; or

27      (b)    Emergency response report as required by Paragraph 4.4.

28

33

A/73055612.2

11.1.2 For the following major deliverables or work, stipulated penalties shall accrue in the amount of $1,000 per day, per violation, for the first seven (7) days of noncompliance, and $2,500 per day, per violation thereafter,:

(a)     Performance of any Essential Activity identified in Exhibit C; or

(b)     Performance of the Engineering Evaluation/Cost Analysis identified in Exhibit D; or

(c)     Immediately notifying DTSC of an emergency or taking immediate action to address an emergency as set forth in Paragraph 4.4. (Disputes over the appropriate response to be taken should be resolved through the dispute resolution provisions of the Second Consent Decree and shall not subject the Settling Defendants to Stipulated Penalties).

11.2   Settling Defendants may dispute DTSC's right to the stated amount of penalties by invoking the dispute resolution procedures under Paragraph 14.1 herein. Penalties shall accrue but need not be paid during the dispute resolution period. If Settling Defendants do not prevail upon resolution, all penalties shall be due to DTSC within thirty (30) days of resolution of the dispute. If Settling Defendants prevail upon resolution, no penalties shall be paid.

11.3   These stipulated penalties provisions do not preclude DTSC from pursuing any other legal remedies or sanctions that are available to DTSC because of the Settling Defendants' failure to comply with the Second Consent Decree. Payment of stipulated penalties does not alter Settling Defendants' obligation to complete performance under the Second Consent Decree.

## XII.   PUBLIC COMMENT

12.1   The Second Consent Decree shall be subject to a public comment period for not less than thirty (30) days after lodging with the Court. DTSC may modify or withdraw its consent to the Second Consent Decree if comments received disclose facts or considerations that indicate that the Second Consent Decree is inappropriate, improper or inadequate.

34

1  XIII.  EFFECTIVE DATE

2      13.1  The Effective Date of the Second Consent Decree shall be the date on

3  which it is entered by the Court.

4  XIV.  DISPUTE RESOLUTION

5      14.1  Any dispute that arises between the Parties with respect to an

6  obligation under the Second Consent Decree shall, in the first instance, be the

7  subject of good faith negotiations among the Parties. The Parties agree that they

8  shall use their best efforts to resolve any dispute informally. In the absence of

9  agreement, any Party may submit the matter to the Court for resolution. The Court

10  shall retain jurisdiction over this matter and the parties for the purpose of

11  interpreting and enforcing the terms of this Second Consent Decree, including the

12  resolution of any such dispute.

13  XV.  SIGNATORIES

14      15.1  Each undersigned representative of the Parties to the Second Consent

15  Decree certifies that he or she is fully authorized to enter into the terms and

16  conditions of the Second Consent Decree and to execute and legally bind the Parties

17  to the Second Consent Decree.

18      15.2  The Second Consent Decree may be executed and delivered in any

19  number of counterparts, each of which when executed and delivered shall be

20  deemed to be an original, but such counterparts shall together constitute one and the

21  same document.

22      SO ORDERED, APPROVED, SIGNED, AND ENTERED THIS 10th of

23  August, 2010.

24

25  *Christine A. Snyder*

26  THE HONORABLE CHRISTINA A. SNYDER
    UNITES STATES DISTRICT JUDGE

27  Party Signature Pages on the Following Pages.

28

A/73055612.2

1    CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL AND
     CALIFORNIA TOXIC SUBSTANCES CONTROL ACCOUNT
2

3

4

5    DATE: MARCH 30, 2010        By: _____
                                     SIGNATURE

6

7                                    ALLEN K WOLFENDEN
                                     NAME (printed or typed)
8                                    PERFORMANCE MANAGER

9                                    SAN JOAQUIN & LEGACY LANDFILL OFFICE
                                     TITLE (printed or typed)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    38
                              CONSENT DECREE

LA/40326858.3

1

2   APPROVED AS TO FORM AND CONTENT:

3

4   Dated: ~~APRIL~~   , 2010

5      May 4

6                                      James Potter
                                       Deputy Attorney General
7                                      Attorney for Plaintiffs

8

9   Dated: APRIL 16, 2010

10                                     James Dragna
                                       Bingham McCutchen, LLP
11                                     Attorney for Settling Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---
                                    37
                            CONSENT DECREE

LA/40326858.3

1    AMERICAN HONDA MOTOR CO., INC.

2

3

4    DATE:  ___8/12/09___          By: _____

5                                       SIGNATURE

6                                       _Timothy J. Conley_____

7                                       NAME (printed or typed)

8                                       _Vice President + General Coun_

9                                       _Honda North America, Inc.____

10                                      TITLE (printed or typed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT DECREE

1  ANADARKO E&P COMPANY LP

2

3

4  DATE: 8/18/09 _____  By: David J Owens _____
                                        SIGNATURE
5

6
                                     David J. Owens _____
7                                    NAME (printed or typed)

8
                                     Associate General Counsel ___
9                                    TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**CONSENT DECREE**

1   ATLANTIC RICHFIELD COMPANY, on behalf of itself and its affiliated entities

2

3

4   DATE: _Sept. 11, 2009_    By: _____

5                                     SIGNATURE

6                         _H. C. WINSOR_

7                                       NAME (printed or typed)

8

9                        _Deputy Operations Manager_

                                   TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA/40326858.3

1   BAYER CROPSCIENCE INC.

2

3

4   DATE: _September 25, 2009_       By: _____

5                                          SIGNATURE

6                                          Luke W. Mette

7                                          NAME (printed or typed)

8

9                                          President, SMC LLC

10                                         TITLE (printed or typed)

11  ON BEHALF OF ITS AFFILIATES,
    AND AS AUTHORIZED AGENT FOR
12  BAYER CROPSCIENCE INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT DECREE

1   THE BOEING COMPANY, on its own behalf and as successor to McDonnell
    Douglas Corporation, Hughes Helicopters, Inc., and certain aerospace and defense
2   assets of Rockwell International

3

4

5   DATE: March 15, 2010          By: _____
                                       SIGNATURE
6

7
                                       _STEVEN  L  SHESTAG_
8                                      NAME (printed or typed)

9
                                       _Director, Environmental Remediation_
10                                     TITLE (printed or typed)

11                                         The  BOEING  Co.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  CHEMICAL WASTE MANAGEMENT, INC., on behalf of itself and its affiliated
   entities

2

3

4  DATE: 9/3/09                    By: _____
5                                      SIGNATURE
6
7                                      Steven D. Richtel
8                                      NAME (printed or typed)
9                                      Group Director
10                                     TITLE (printed or typed)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                              CONSENT DECREE

LA/40326858.3

1   CHEVRON ENVIRONMENTAL MANAGEMENT COMPANY, a California
2   corporation, for itself and as Attorney-in-Fact for its affiliated entities

3

4

5   DATE: March 18, 2010                    By: _____
                                            SIGNATURE
6

7                                           Frank G. Soler
                                            _____
8                                           NAME (printed or typed)

9                                           Assistant Secretary
                                            _____
10                                          TITLE (printed or typed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A/73223520.1/3001863-0000308648

1  CITY OF LOS ANGELES, ACTING BY AND THROUGH THE LOS ANGELES
   DEPARTMENT OF WATER AND POWER
2
3
4
5  DATE: _____10\1\09_____    By: _____
                                      SIGNATURE
6
7                                  H. David Nahai
                                   _____
8                                  NAME (printed or typed)
9                                  Chief Executive Officer and
                                   General Manager
10                                 TITLE (printed or typed)
11
12
13
14
15
16              APPROVED AS TO FORM AND LEGALITY
                CARMEN A. TRUTANICH, CITY ATTORNEY
17
18                      AUG 28 2009
19              BY_____
                ROBERTA SCHARLIN-ZINMAN
20              DEPUTY CITY ATTORNEY
21
22
23
24
25
26
27
28

AUTHORIZED BY RES. 010 103
SEP 15 2009

1    CONOCOPHILLIPS COMPANY, on behalf of itself and its affiliated entities

2

3

4    DATE: _12-8-2009_          By: _____

5                                   SIGNATURE

6                                   _John Skopak_

7                                   NAME (printed or typed)

8

9                                   _Manager - Risk Management + Regulation_

10                                  TITLE (printed or typed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     _____
                        CONSENT DECREE

     LA/4032685.3

     BKK: second consent decree

1  THE DOW CHEMICAL COMPANY

2

3

4  DATE: _12/3/09_          By: _____
                                SIGNATURE
5

6                               _Gregory G. Cochran_
7                               NAME (printed or typed)

8

9                               _Director of Remediation_
                                TITLE (printed or typed)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A/73223520.1/6001863-0000308648

1   DUCOMMUN AEROSTRUCTURES, INC.

2

3

4   DATE: SEPTEMBER 15, 2009    By: _____

5                           SIGNATURE

6

7                           JAMES S. HEISER
                            NAME (printed or typed)

8

9                           SECRETARY
                            TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

CONSENT DECREE

LA/40326858.3

Case 2:18-cv-05836-MWF-PLA   Document 634-4   Filed 12/05/25   Page 50 of 92   Page
ID #:11462
Case 2:10-cv-09578-CAS-AJW   Document 14   Filed 05/10/10   Page 49 of 91   Page ID #:900

1. EXXON MOBIL CORPORATION, on behalf of itself, and its subsidiaries and
2. affiliated entities:
3.
4.
5. DATE: _November 6, 2009_          By: _____
                                         SIGNATURE
6.
7.                                      _Michael W. Schueur_
8.                                      NAME (printed or typed)
9.
                                        _Agent and Attorney-in-fact_
10.                                     TITLE (printed or typed)
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.

**CONSENT DECREE**

1   GEMINI INDUSTRIES, INC.

2

3

4   DATE: March 15, 2010 _____      By: _____
                                          SIGNATURE
5

6                                          Dr. M. ElGuindy
                                          _____
7                                          NAME (printed or typed)

8                                          CEO
                                          _____
9                                          TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_____
                        CONSENT DECREE

A/73223520.1/3001863-0000308648

1    GENERAL LATEX AND CHEMICAL CORPORATION

2

3

4    DATE: _12/3/09_____        By: _Gregory G. Cochran_____

5                                        SIGNATURE

6                                   _Gregory G. Cochran_____

7                                        NAME (printed or typed)

8

9                                   _Director of Remediation_

                                         TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT DECREE

1  HONEYWELL INTERNATIONAL INC., on behalf of itself and its affiliated
2  entities

3

4  DATE: 12/16/09                    By: _____
5                                        SIGNATURE

6

7                                    _____
                                     Benny Dehghi
8                                    NAME (printed or typed)

9                                    _____
                                     Manager
10                                   TITLE (printed or typed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_____
                                CONSENT DECREE

LA/403268583

1   HUNTINGTON BEACH COMPANY, a California corporation

2

3

4   DATE: _3 Sept 2009_    By: _____

5                         SIGNATURE

6

7                        **Frank G. Soler**
                        NAME (printed or typed)

8

9                       **Assistant Secretary**
                        TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA/40326858.3

1   LOCKHEED MARTIN CORPORATION on its own behalf and as successor in
    interest to Martin Marietta, Martin Marietta Carbon, Lockheed, Lockheed Aircraft,
2   Lockheed California Company, Lockheed Corporation, Lockheed Advanced
    Marine Systems, and Lockheed Martin Aeronautics Company.
3

4

5
    DATE: March 17, 2010                By: _____
6                                            SIGNATURE

7

8                                            C. Douglas Goins
                                             NAME (printed or typed)
9

10                                           Associate General Counsel
11                                           TITLE (printed or typed)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A/73223520.1/3001863-0000308648

1  McFARLAND ENERGY, INC, a Delaware corporation (successor-in-interest to
2  Seaboard Oil Company)

3

4  DATE: _9/3/09_____           By: _____
5                                      SIGNATURE

6

7                                      **Hongyan Xun**
8                                      NAME (printed or typed)

9                                      **Assistant Secretary**
10                                     TITLE (printed or typed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                              CONSENT DECREE

LA/40326858.3

Case 2:18-cv-05936-MWF-RAO   Document 634-4   Filed 12/05/25   Page 157 of 92   Page
ID #:11469
Case 2:10-cv-09385-CAS-AJW   Document 4   Filed 06/10/10   Page 56 of 91   Page ID #:307

1  MORTON INTERNATIONAL, INC.

2

3

4  DATE: 3-DEC-2009        By: [signature]

5                          SIGNATURE

   ON BEHALF OF ROHM AND HAAS CHEMICALS, INC.
6  AN AUTHORIZED SIGNATORY FOR MORTON INTERNATIONAL, INC.

   ROBERT L. CASSELBERRY, JR.
7                          NAME (printed or typed)

8

9  [signature] REMEDIATION MGR.

   TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT DECREE

A/73223520.1/3001863-0000308648

1  NATIONAL STEEL AND SHIPBUILDING COMPANY

2

3

4  DATE: 8/19/2009          By: Mousa
5                           SIGNATURE

6                           MATTHEW S. LUXTON
7                           NAME (printed or typed)

8
9                           VICE PRESIDENT + GENERAL COUNSEL
                            TITLE (printed or typed)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT DECREE

LA/40326858.3

1    NORTHROP GRUMMAN CORPORATION, on behalf of itself and its affiliated
2    entities

3

4
     DATE: __8/12/2009__          By: _____
5                                       SIGNATURE

6

7                                       __JOSEPH P. KWAN__
8                                       NAME (printed or typed)

                                        CORPORATE DIRECTOR
9                                       ENVIRONMENTAL REMEDIATION
10                                      TITLE (printed or typed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     _____
                            CONSENT DECREE

1    QUEMETCO, INC.

2

3

4    DATE: 1/5/2010                    By: _____

5                                      SIGNATURE

6                                      _____

7                                      Daniel M. Crowley, Esq.

                                       NAME (printed or typed)

8

9                                      Attorney

                                       TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              CONSENT DECREE

1  RAYTHEON COMPANY for itself and as successor to Hughes Aircraft Company

2

3

4  DATE: 3/11/2010                    By: _____

5                                        SIGNATURE

6

7                                        Robert J. Moore
                                         NAME (printed or typed)

8

9                                        Vice President – Business Services
                                         TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONSENT DECREE**

1  ROHR, INC., on behalf of itself and its affiliated entities

2

3

4  DATE: Aug 23 2009          By: _____

5                                 SIGNATURE

6.

7                                 Marc A. Duvall
                                  _____
                                  NAME (printed or typed)

8

9                                 Vice President
                                  _____
                                  TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   ROHM AND HAAS COMPANY

2

3

4   DATE: 3-DEC-2009          By: _____

5                                 SIGNATURE

6                             _____

7                             ROBERT L. CASSELBERRY JR.

                              NAME (printed or typed)

8

9                             REMEDIATION MGR.

                              TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT DECREE

1   SHELL OIL COMPANY, on behalf of itself and its affiliated entities

2

3

4   DATE: ___9-10-09___              By: _____
                                          SIGNATURE
5

6                                         Wm. E. Platt
7                                         NAME (printed or typed)

8
                                          Mgr. E//// Business
9                                         TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
    _____
                          CONSENT DECREE

LA/40326858.3

1   SOUTHERN CALIFORNIA EDISON COMPANY

2

3

4   DATE: _9/4/09_          By: _____
                                    SIGNATURE
5

6                                 _Cecil R. House_
7                                 NAME (printed or typed)

8
                                  _Sr. VP, Safety, Operations Support & CA_
9                                 TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                              CONSENT DECREE

LA/40326858.3

Case 2:18-cv-05886-MWF-PLA Document 634-14 Filed 12/05/25 Page 66 of 92 Page
ID #:11478
Case 2:40-cv-09578-CAS-AJW Document 14 Filed 06/10/10 Page 65 of 99 Page ID #:916

1  THUMS LONG BEACH COMPANY

2

3

4  DATE: 11/03/09          By: _____

5                              SIGNATURE

6                              Frank Komin

7                              NAME (printed or typed)

8                              General Manager

9                              TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT DECREE

LA/40326858.3

1    UNION CARBIDE CORPORATION

2

3

4    DATE: September 2, 2009        By: _Mary H. Terzino_

5                                  SIGNATURE

6

7                           Mary H. Terzino
                          NAME (printed or typed)

8                           Representing Union Carbide Corporation

9                           under a Service Agreement
                          TITLE (printed or typed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

CONSENT DECREE

1    UNION OIL COMPANY OF CALIFORNIA, a California corporation, on behalf
      of itself and its affiliated entities

2

3

4

5    DATE: _____9/3/09_____      By: _____

                                        SIGNATURE

6

7                                 **Hongyan Xun**

8                     NAME (printed or typed)

9                            **Assistant Secretary**

10                    TITLE (printed or typed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT DECREE

LA/40326858.3

1   WASTE MANAGEMENT COLLECTION AND RECYCLING, INC, on behalf of
    itself and its affiliated entities

2

3

4   DATE: _9/3/09_____        By: _____
5                                 SIGNATURE

6

7                                 _Steven D. Richtel_____
                                  NAME (printed or typed)
8

9                                 _Group Director_____
10                                TITLE (printed or typed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                CONSENT DECREE

LA/40326858.3

1    WESTERN WASTE INDUSTRIES, on behalf of itself and its affiliated entities

2

3

4    DATE: _9/3/09_          By: _____

5                                SIGNATURE

6                                _Steven D. Bichtel_

7                                NAME (printed or typed)

8

9                                _Group Director_

10                               TITLE (printed or typed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                            CONSENT DECREE

LA:0326858.3

1  XEROX CORPORATION

2

3

4  DATE: 12/2/09                    By: _____
                                        SIGNATURE
5

6                                       Patricia A. Calkins
7                                       NAME (printed or typed)
8                                       Vice President
9                                       Environment, Health +
                                        TITLE (printed or typed)   Safety
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A/73055613.2

Case 2:18-cv-05596-CAS-AJW Document 14 Filed 08/10/18 Page 71 of 91 Page ID #:922

# EXHIBIT A-1

## Map of BKK Facility and Surrounding Area

## EXHIBIT A-2

### LEGAL DESCRIPTION OF THE FACILITY

The Facility consists of 583 acres and can be described by the Government Survey Method as: that portion of Rancho La Puente in the City of West Covina, County of Los Angeles known as Lot 3, as shown on a record of survey recorded in Book 85, pages 10 through 12 inclusive, on file in the Office of the County Recorder in said county.

**Exhibit B**

**This Page Left Intentionally Blank**

# EXHIBIT C

## ESSENTIAL ACTIVITIES

The following Facility operations shall be performed in order to protect human health and the environment and avoid damage to the Facility due to operational lapses.

1. <u>Class I and Class III Landfill - Gas Collection and Migration Control System</u>

   a) Operate, monitor, and maintain the perimeter and interior gas extraction system, including blowers.
   b) Monitor the landfill gas perimeter probes to evaluate gas conditions.
   c) Operate and maintain gas condensate collection systems.

   These systems shall be operated continuously and shall be operated consistent with the June 20, 2000, SCAQMD Rule 1150.1 Compliance Plan and any subsequent revisions thereto, the Stipulated Permanent Injunction approved on or about October 28, 1988 (Case No. C507317), the RCRA 3008(h) Orders (Docket Nos. RCRA 09-89-0019 and 09-2000-0003), the Operation Plan for the Class I landfill, applicable provisions of the DTSC final Post-closure Permit issued on June 30, 2004, and the California Code of Regulations, title 22.

2. <u>Landfill Gas Combustion System</u>

   These systems include the onsite Landfill Gas Flare Stations 1 and 2. These systems use flares to burn low BTU value landfill gas (usually from the perimeter gas collection system) and off-gases from the onsite Leachate Treatment Plant (LTP). There are a total of 10 flares, but only five are typically used. Use of flares must be balanced with demand from the cogeneration plant. Actions shall include operation, monitoring, and maintenance of the flare stations and gas lines.

   These systems shall be operated continuously. If the energy recovery systems cease to operate, all collected gases shall be burned at the flare stations. Monitoring and maintenance of this system shall be consistent with the applicable SCAQMD permits, the June 20, 2000, SCAQMD Rule 1150.1 Compliance Plan and any subsequent revisions thereto; the Operation Plan for the Class I landfill and any amendments thereto, the applicable provisions of the DTSC Post-closure Permit issued June 30, 2004, and the California Code of Regulations, title 22.

3. **a)** <u>Class I Landfill Clayey/Vegetative Cover/Irrigation System</u>

These systems shall be operated and maintained with the goals to 1) prevent surface emissions of landfill gas and volatile organic compounds (VOCs) into the air, and 2) prevent infiltration of precipitation into the waste prism. Required operations include:

1) Regular inspection;
2) Maintain optimum moisture content in the clayey cap;
3) Repair cracks in the clayey cap;
4) Perform maintenance with the goal to prevent erosion of the clayey cap;
5) Replace eroded cap material;
6) Maintain the vegetative cover with the goal to prevent erosion of the clayey cap;
7) Operate the irrigation system (daily); and
8) Maintain the irrigation system.
9) Replace all nonfunctional irrigation controllers. Install irrigation system telemetry. Also purchase and install master irrigation control station.
10) Inspect all irrigation system pumps and carry out necessary maintenance and repairs as needed.

These operations shall be performed consistent with the California Code of Regulations, title 22, the June 20, 2000, SCAQMD Rule 1150.1 Compliance Plan and any subsequent revisions thereto, the Operation Plan for the Class I landfill and any amendments thereto, and applicable provisions of the DTSC final Post-closure Permit issued June 30, 2004.

**b)** <u>Class I Landfill Cover Air Monitoring</u>

Continue the following monitoring activities:

1) Monitor ambient air pursuant to SCAQMD Rule 1150.1.
2) Monitor integrated surface emissions [routed/grid based] pursuant to SCAQMD Rule 1150.1.
3) Monitor instantaneous surface emissions [grid based] pursuant to SCAQMD Rule 1150.1.
4) Monitor vinyl chloride at Nogales End.

This monitoring shall be conducted consistent with the June 20, 2000, SCAQMD Rule 1150.1 Compliance Plan and any subsequent revisions thereto, applicable provisions of the DTSC final Post-closure Plan for the Class I landfill, and the California Code of Regulations, title 22.

4.    **Leachate Extraction Systems**

These systems shall be operated, maintained and monitored to minimize further migration of contaminated ground water plumes.  Operations shall include:

a)    Operate, inspect, and maintain Class I leachate extraction sumps, pumps, tanks, and lines to ensure that ground water/leachate collection is fully operational and provides unobstructed flow to the LTP.

b)    Collect all liquids from remote sumps, tanks, and basins (not piped to the LTP) and transport via vacuum truck to the LTP.

c)    Operate, inspect, and maintain the Class III leachate collection system.

d)    Identify all leachate collection wells that are not operational and repair and redevelop as needed to bring them into full operational status.

e)    Purchase backup pump for the Nogales End leachate collection tank (Grundfos stainless steel, 3 hp)

Operations shall be performed consistent with the Stipulated Permanent Injunction approved on or about October 28, 1988 (Case No. C50713), the DTSC Operation Plan for the Class I landfill and any subsequent amendments, applicable provisions of the DTSC final Post-closure Plan issued June 30, 2004, and the California Code of Regulations, title 22.

5.    **On-Site Leachate Treatment Plan (LTP)**

The LTP shall be operated continuously.  It treats contaminated groundwater and leachate from the Class I and Class III landfills, the collected gas condensate from gas extraction wells (part of the operation and maintenance of the gas collection system), and other liquids.  Gases generated in the LTP treatment tanks are piped to the flare stations for combustion.  Operations shall include:

a)    Operate, maintain, and inspect the facility piping, tanks, and mechanical devices.

b)    Monitor effluent as required by the permit and other regulatory requirements.

c)    Properly dispose of all hazardous wastes generated by the LTP.

LTP operations shall be performed consistent with applicable provisions of permits issued by DTSC, the SCAQMD, and the LARWQCB.  Operations shall also comply with the Operation Plans for the LTP and the Class I landfill and the California Code of Regulations, title 22.

6. **Barriers 1 and 2 Extraction System**

Approximately nine (9) to twelve (12) site extraction wells are currently operated at Barriers 1 and 2. Two (2) of the wells are inactive. Response actions include:

a) Operate, inspect, and maintain Class I groundwater extraction wells, sumps, pumps, tanks, and lines to ensure that groundwater collection is fully operational and provides unobstructed flow to the LTP.

b) Operate, inspect, and maintain all other groundwater pumps, piping, and other equipment to maintain unobstructed flow to the LTP. This system includes the Miranda Springs Groundwater Pumping Well (Well MR-01) which is continuously pumped to prevent groundwater contaminated with vinyl chloride from manifesting as an artesian spring.

Operations shall be performed consistent with the Stipulated Permanent Injunction approved on or about October 28, 1988 (Case No. C507317), the Operation Plan for the Class I landfill and any subsequent amendments, applicable provisions of the DTSC final Post-closure Permit issued June 30, 2004, and the California Code of Regulations, title 22.

7. **Facility Maintenance**

The following Facility maintenance operations shall be provided to support other critical operations related to the Subject Property. At a minimum, the following shall be maintained:

a) Access roads.
b) Surface water run-on and run-off control systems.
c) Storm drains to the extent feasible. Specifically repair "north haul road" drain and "south haul road" drains to avoid backup, overflow, and cap damage.

Maintenance shall be provided consistent with the DTSC Operation Plan for the Class I landfill and any amendments thereto, applicable provisions of the DTSC final Post-closure Permit issued on June 30, 2004, and the California Code of Regulations, titles 22 and 27.

8. **Facility-Wide Security**

Twenty-four (24) hour security service shall be provided to control access to the landfills and surrounding property and to ensure trespassing and vandalism does not occur. These operations shall include:

a) Periodic inspection and repair (as needed) of the perimeter fence;

      b)     Inspection and maintenance of security devices such as locks, lights, inspection tags, and alarms;

      c)     Periodic inspection and monitoring of specific locations, equipment, and facilities;

      d)     The security service must cover the entire Facility including the Class I landfill, the Class III landfill, the LTP, and the cogeneration plant.

Security shall be provided consistent with the DTSC Operation Plan for the Class I landfill and any amendments thereto, applicable provisions of the DTSC final Post-closure Permit issued on June 30, 2004, the California Code of Regulations, title 22, the closure and post-closure plans for the Class III landfill and the California Code of Regulations, title 27.

**9.**     **Reporting to Agencies**

Collect and tabulate, in the same way currently conducted by DTSC, environmental data that is necessary for the BKK Corporation, the current owner/operator, to comply with required reporting to all agencies with jurisdiction at the Facility, including, but not limited to, DTSC, LARWQCB, SCAQMD, CIWMB, the City of West Covina (the Local Enforcement Agency, LEA), for monitoring or other activities required by these agencies. Provide the raw data and tabulations to the BKK Corporation and DTSC. The collection of this environmental data is limited to only that data that is pertinent to the Subject Property systems that are within the scope of this Consent Decree (e.g., specifically excludes collection of any Class III landfill data or groundwater quality data).

Provide the collected environmental data pursuant to a schedule provided by DTSC so that reporting can be conducted in accordance with schedules, conditions and requirements of the respective agencies.

Exhibit D

# STATEMENT OF WORK
## People v. American Honda et al (BKK Landfill)
## Second Consent Decree

This Statement of Work (SOW) describes the work to be performed in conjunction with preparation of an Engineering Evaluation/Cost Analysis (EE/CA) for the BKK Class I Landfill.

### 1. Objectives and Scope of the EE/CA

The objectives of the EE/CA and associated work are to:

A.  Perform an EE/CA and prepare an EE/CA Report for the BKK Class I Landfill (the Landfill) in accordance with this SOW, the Consent Decree and § 300.415 of the National Contingency Plan (NCP) and consistent with the Guidance on Conducting Non-Time-Critical Removal Actions Under CERCLA, EPA/540-R-93-057 (the EE/CA Guidance).

B.  Evaluate the conformance of the "Landfill Systems" at the Landfill with "Performance Standards". (Terms in quotation marks defined herein).

C.  Identify removal action alternatives to conform the Landfill Systems to the Performance Standards.

D.  Develop, organize, and maintain an administrative record file for the EE/CA in accordance with § 300.820 of the NCP, and consistent with the EE/CA Guidance.

E.  Propose a non time-critical removal action that fulfills the objectives developed using the EE/CA Guidance and that "contribute[s] to the efficient performance of any long term remedial action" for the Landfill. 42 U.S.C. § 9604(a)(2). It is anticipated that a remedial investigations feasibility study and that remedial actions will be conducted at the Landfill at the conclusion of the EE/CA.

In accordance with the EE/CA Guidance, the EE/CA shall 1) collect existing and new data regarding the source, nature and extent of contamination at the Landfill and regarding the Landfill Systems, sufficient to compare the long-term cost-effectiveness of replacing versus repairing those Systems or their components and sufficient to prepare the EE/CA Report described in Section 2 below; 2) based on that data, identify components or subcomponents of those Systems in need of replacement or repair, and 3) propose a removal action that, to the extent practicable, brings those Systems into conformance with the Performance Standards.

The "Landfill Systems" include equipment and related appurtenances that contain and transmit gas and liquid-phase contaminated media and include the Landfill cover, Landfill gas extraction and destruction, conveyance and treatment and the Landfill leachate collection, conveyance and treatment systems as described further in Sections 1.1 through 1.3, below.

STATEMENT OF WORK – Exhibit D
People v. American Honda et al (BKK Landfill)
Second Consent Decree

1.1.    Landfill Cover System

The Landfill cover system components include the following subsystems and
features: i) Monolayer soil cover; ii) Vegetative layer; iii) Irrigation system; iv)
Access and bench roads; v) Storm water collection, conveyance, detention and
drainage system; vi) Settlement monuments; vii) and related infrastructure.

1.2.    Landfill Gas Extraction, Conveyance and Treatment Systems

The Landfill gas extraction, conveyance and treatment systems components include
the following subsystems and features: i) Landfill gas wells; ii) Landfill gas
conveyance lines; iii) Landfill gas blowers ; iv) flare stations Nos. 1 and 2; v)
perimeter Landfill gas compliance probes; vi) meteorological stations; vii) and
related infrastructure.  The relationship and interaction of the co-generation facility
operating parameters to the Landfill gas extraction, conveyance and treatment
systems shall be included in the systems effectiveness evaluation and design.

1.3.    Leachate and Condensate Collection, Conveyance, Treatment and Disposal
        System

The leachate and condensate collection, conveyance,  treatment and disposal
system includes the following subsystems and features: i) the leachate and
condensate collection system piping, ii) leachate extraction wells, horizontal wells
and well pumps iii) tanks, iv) related infrastructure, and v) the leachate treatment
plant (LTP) and its components, subsystems and features.

The analysis of Landfill System components, such as the flares, the LTP, and the
piping leading to the flares and the LTP, that serve the Class III landfill as well as
the Class I landfill, shall address the burden on those components from the Class III
landfill.  This provision does not require the Settling Defendants to address
equipment that serves the Class III landfill only.

The EE/CA shall include a study of the feasibility of off-site disposal of the F-039
treated effluent from the LTP.

## 2. EE/CA and EE/CA Report Components

The EE/CA Report shall follow the outline specified in Exhibit 5 of the EE/CA
Guidance and the EE/CA shall be performed as detailed below.

2.1.    Executive Summary

STATEMENT OF WORK – Exhibit D
People v. American Honda et al (BKK Landfill)
Second Consent Decree

The EE/CA Report shall include an Executive Summary providing a general overview of the contents of the EE/CA, a description of the Landfill and a summary of the current or potential threats posed by the Landfill. It will also identify the scope and objectives of the removal action and recommend a removal action alternative.

2.2. Site Characterization

The Site Characterization section of the EE/CA Report shall summarize and analyze data about the physical and other characteristics of the Landfill. The components of the Site Characterization section are identified and described in the following sections 2.2.1 through 2.2.6.

2.2.1. Landfill Description and Background.

This subsection shall describe the history, setting and contents of the Landfill based on existing data, as outlined in Exhibit 5 of the EE/CA Guidance.

2.2.2. Design of Landfill Systems

This subsection shall describe the existing Landfill Systems on the Landfill, their design, construction and testing and shall include the following information to the extent it is available.

2.2.2.1. Design standards and requirements for the cover including design life of the system, thickness and specification of the soil cover, static and dynamic stability, storm event design, vegetative layer plant palette, gas impermeability and irrigation needs.

2.2.2.2. Design standards and requirements for the leachate collection, conveyance and treatment systems.

2.2.2.3. Design standards and requirements for the Landfill gas extraction, conveyance and treatment systems.

2.2.2.4. Construction completion report for the Landfill Systems.

2.2.3. Existing Data Regarding the Landfill and Contamination

This section of the EE/CA Report shall present existing data about the Landfill. During the Landfill's operation, closure and post-closure periods, BKK Corp., government agencies, and contractors have gathered extensive data at and about the Landfill, including data that may be relevant to the Landfill's conformance or non conformance with the Performance Standards.

2.2.4. Data Gaps, Field Investigations and New Analytical Data

This section of the EE/CA Report shall identify all data gaps and present new analytical data regarding the Landfill. "Data gaps" are instances where the existing data are not sufficient to fulfill the EE/CA objectives as described in sections 1 and 2.3 of this SOW. As part of the EE/CA, the Settling Defendants shall conduct field investigations sufficient to fill data gaps.

New sampling shall comply with existing local, state or EPA guidance, procedures and protocols and with the most-recently approved health and

STATEMENT OF WORK – Exhibit D
People v. American Honda et al (BKK Landfill)
Second Consent Decree

safety plan and Quality Assurance Project Plan (QAPP). The Landfill systems or components to be addressed in field investigations shall include those described in Section 1 of this SOW. The Settling Defendants shall also follow data gathering guidelines that USEPA has offered for the Superfund Accelerated Cleanup Model. The Draft Field Investigation Work Plan and Draft QAPP will be submitted to DTSC for review and comment per the deliverable schedule. DTSC will issue an approval letter of the Final Field Investigation Work Plan prior to commencement of the field investigation.

2.2.5. Evaluation of Landfill Systems

This section of the EE/CA report shall apply the existing and new data to evaluate the condition of the Landfill Systems, especially their ability to meet Performance Standards. The Landfill Systems evaluation shall include physical parameters (e.g., liquid and gas permeability). The evaluation of the cover system shall include an analysis of the ability of the Cover to meet liquid-infiltration-limit Performance Standards using the HELP model.

2.2.6. Streamlined Risk Evaluation (SRE)

This section shall present the results of a streamlined human health risk evaluation, which will identify the chemicals of concern, propose a Conceptual Site Model and assess all applicable exposure pathways. The SRE shall follow the risk evaluation process described in section 2.4 of the EE/CA Guidance. The focus of the SRE shall be to provide an understanding of 1) Contaminant source(s) and locations, and any media contaminated as a result of releases from the source(s); 2) Description and condition of systems used to contain hazardous substances; 3) Degree of contamination (quantity, concentration, etc.); 4) Physical and chemical properties of the contaminants; and 5) Potential receptors. The SRE shall discuss the human health risk of any proposed remedies and shall identify and focus on the specific contaminants, exposure routes and receptors that the removal action is intended to address.

2.3.    Identification of Removal Action Goals and Objectives, and Performance Standards

This section of the EE/CA Report shall identify in sufficient additional detail, the goals and objectives of the removal action and shall also indentify the Performance Standards.

2.3.1. Removal Action Goals and  Objectives

The Removal Action Goals and Objectives will be formulated as described in section 2.5 of the EE/CA Guidance.  The removal action shall comply with § 300.700(b)(5)(vi) of the NCP and with the EE/CA Guidance.  The EE/CA will not impede the design, construction or implementation of a future final remedy, if deemed necessary by a future CERCLA Remedial Investigation/Feasibility Study.

2.3.2  Identification of Performance Standards

STATEMENT OF WORK – Exhibit D
People v. American Honda et al (BKK Landfill)
Second Consent Decree

In accordance with the EE/CA Guidance and the NCP (40 CFR §§ 300.415(j), 300.400(g)(3), 300.700(b)(5)(vii)), the following Performance Standards shall be identified: 1) Applicable or Relevant and Appropriate Requirements (ARAR's) and 2) other materials "to be considered" (TBC's) that may be useful in formulating the removal action that would appropriately abate, prevent, minimize, stabilize, mitigate, or eliminate the release or the threat of release of hazardous substances from the Landfill. Potential TBC's shall include without limitation the post closure permit for the BKK Class I Landfill, and other advisories, criteria or guidance. The Performance Standards shall be included in the EE/CA Report.

## 2.4. Determination of Removal Schedule

This section of the EE/CA Report shall propose the schedule for the removal action. The schedule shall take into account the time-sensitive nature, or urgency, of the removal as well as the limitations on the removal as a result of weather conditions and other appropriate factors.

## 2.5. Identification and Analysis of Removal Action Alternatives

Based on the information gathered and analyzed during the Site Characterization, the EE/CA Report shall identify alternatives for addressing the removal action objectives. Alternatives shall be compared to Performance Standards, and then evaluated for their effectiveness, implementability and cost, in accordance with the EE/CA Guidance (following the objectives/criteria specified in Exhibit 7 of the Guidance).

The EE/CA Report shall recommend a removal action in accordance with section 2.7 below.

### 2.5.1. Effectiveness

The effectiveness of each alternative shall be evaluated with regard to its ability to meet the Performance Standards in terms of the protectiveness of public health and the environment. Effectiveness shall also be evaluated with respect to the 42 U.S.C. § 9604(a)(2) requirement of contributing to the subsequent remedial actions.

### 2.5.2. Implementability

The implementability evaluation shall consider the technical and administrative feasibility of implementing each alternative.

### 2.5.3. Cost

Capital costs and indirect costs shall be estimated along with the annual operating costs in order to determine the projected long and short-term costs of a removal action. After calculating the cost, the present value of the cost for those actions lasting longer than 12 months shall also be calculated.

## 2.6. Comparative Analysis of Removal Action Alternatives

STATEMENT OF WORK – Exhibit D
People v. American Honda et al (BKK Landfill)
Second Consent Decree

The EE/CA report shall compare the relative performance of each of the removal action alternatives in a matrix and with supporting narrative. Ranking factors shall be established to aid in the selection of the most appropriate removal action.

2.7. Recommended Removal Action Alternative

The comparative analysis conducted in the previous section shall be used to identify the removal action (if any) that best satisfies the evaluation criteria.

## 3. EE/CA Deliverables.

The Settling Defendants shall submit the EE/CA deliverables to DTSC for review and approval as specified on the attached schedule.

3.1. EE/CA Work Plan

The EE/CA Work Plan shall describe the work to be performed 1) during each of the Site Characterization stages, sections 2.2.1. through 2.2.6. above, 2) to identify the removal action goals and objectives, and 3) to analyze and compare the removal action alternatives. It shall include updates to the health and safety and quality assurance project plans and shall demonstrate compliance with 40 C.F.R. 300.415(b)(4). The EE/CA Work Plan shall include protocols for notifying DTSC at least 72 hours before the commencement of any field activities, list applicable guidance manuals, provide a preliminary list of Performance Standards to be followed, and include a work plan for the Streamlined Risk Evaluation. The EE/CA Work Plan shall also include a schedule for conducting the EE/CA and a process for amending that schedule or the Work Plan itself if more time is needed to conduct field investigations than was anticipated in the original approved Work Plan.3.2

3.2 Field Investigation Work Plan

The Field Investigation Work Plan shall describe new sampling to be performed to fill data gaps identified during the implementation of the EE/CA Work Plan and to provide sufficient information to prepare the EE/CA Report described in Section 2 above. The Draft Field Investigation Work Plan and Draft QAPP shall be submitted to DTSC for review and comment per the deliverable schedule. The field investigation shall not be commenced until DTSC has issued an approval letter of the Final Field Investigation Work Plan

3.3 EE/CA Report

The EE/CA Report shall be prepared as specified in the EE/CA Guidance.

3.4 Data Compilation

The Settling Defendants shall prepare and maintain a database of all Landfill data that they collect as part of the EE/CA. The database shall be fully accessible by DTSC and its contractors, as described in section 4.2 of the Consent Decree.

3.5 Action Memorandum

STATEMENT OF WORK – Exhibit D
People v. American Honda et al (BKK Landfill)
Second Consent Decree

The Settling Defendants shall submit a draft Action Memorandum to DTSC as specified on the attached schedule. The purpose of the Action Memorandum shall be to enable DTSC to select an appropriate removal action.

3.5.1  The Action Memorandum shall substantiate the need for a removal action, identify the proposed removal action, and explain the rationale for the proposed removal action selection.

3.5.2  The Action Memorandum shall follow the standard format and review process described in the EE/CA Guidance.

3.5.3  The Action Memorandum shall be submitted as a deliverable in draft format to DTSC for review and comment. The Settling Defendants shall respond to DTSC comments in a formal transmittal with revisions, as necessary. This SOW does not require the Settling Defendants to submit the Action Memorandum for stakeholder or public comment.

## 4. Quarterly Progress Reports

Quarterly progress reports shall be provided that shall summarize the work that has been performed in the previous quarter, outline the work anticipated in the next quarter, document interactions and agreements between DTSC and the Settling Parties, and describe any problems/concerns that have arisen.

### DELIVERABLE SCHEDULE

|  | Activity | Due[1] |
|---|---|---|
| 1. | Draft EE/CA Work Plan | 12 weeks after entry of Consent Decree |
| 2. | Final EE/CA Work Plan | 4 weeks after receipt of DTSC comments on Draft EE/CA Work Plan |
| 3. | Draft Field Investigation Work Plan/QAPP | 26 weeks after entry of Consent Decree |
| 4. | Final Field Investigation Work Plan/QAPP | 6 weeks after receipt of DTSC comments on Draft FI Work Plan/QAPP |
| 5. | Draft EE/CA  Report | 18 weeks after  completion of Field Investigation |
| 6. | Final EE/CA Report | 8 weeks after receipt of DTSC comments on Draft EE/CA Report |
| 7. | Draft Action Memorandum | 6 weeks after DTSC approval of Final EE/CA Report |
| 8. | Final Action Memorandum | 4 weeks after receipt of DTSC comments on Draft Action Memorandum |

---

[1] These timelines can be adjusted based on mutual agreement of the parties.

**Exhibit E**

**This Page Left Intentionally Blank**

# EXHIBIT F

## POST-CLOSURE INSURANCE REIMBURSEMENT PROTOCOL

1.  The Settling Defendants may request reimbursements for post-closure care activities by submitting to DTSC itemized bills for post-closure care expenditures. The Settling Defendants shall provide sufficient information in order for DTSC to determine that:

    (a)  the post-closure care expenditures are in accordance with the approved Operation/Post-closure Plan or are otherwise justified to comply with post-closure care requirements. (Cal. Code Regs., tit. 22, §§ 66264.145(e)(5) and 662265.145(d)(5), as applicable.); and

    (b)  the reimbursement request adequately documents that: (i) the expenditures were only for the post-closure care activities required in the Operation/Post-closure Plan, the Post-closure Permit or applicable regulations for post-closure care of the closed Class I Landfill unit and (ii) the work was performed during the applicable year. (Cal. Code Regs., tit.22, §§ 66264. 145(e) (5) and 66265. 145(d) (5), as applicable.)

2.  The itemized bills that the Settling Defendants submit with the request for reimbursement shall consist of spreadsheets that provide an overview of the reimbursement requested and detail the costs by task and subtask for each of the Essential Activities and the Critical Task identified in Exhibits C and D. The bills shall include, at a minimum, the tasks and subtasks and the items listed below.

    (a)  Unit rate;
    (b)  Man-hours or quantity;
    (c)  Frequency of activity;
    (d)  Expenditures; and
    (e)  Check number/payment number and date paid.

3. The itemized bills that are submitted with the request for reimbursement shall provide:

    (a) Receipts, and/or invoices for all external vendor[1] expenditures in excess of $100 for which reimbursement is requested for post-closure care activities; and,

    (b Documentation for overhead for which reimbursement is requested; and,

    (c) Documentation and explanation for all engineering or labor expenditures for which reimbursement is requested; and

    (d) Documentation and explanation of work, goods or services that exceed market rate or prevailing rate pricing; and

    (e) Documentation that all expenditures requested for reimbursement have been paid by Settling Defendants.

The Settling Defendants shall not seek reimbursement for amounts above the annual sub-limit of the post-closure insurance policy. The Settling Defendants shall also not seek reimbursement from the post-closure insurance policy for costs attributable to the closure or post-closure care of the Class III Landfill or for other activities not identified in the Operation/Post-closure Plan, the LTP /Class I Post-closure Permit or applicable regulations for post-closure care of the closed BKK Class I Landfill Unit. The Settling Defendants shall not be entitled to reimbursement for attorneys' fees or travel costs.

---

[1] External vendor expenditures include expenditures for work, services, goods, etc., that are provided by external contractors. It does not include the Settling Defendants' internal expenditures for which receipts and invoices are not typically provided such as internal employee labor. External vendor expenditures that are not reimbursable are attorney fees or travel expenditures.

Case 2:18-cv-05586-MWF-RLA Document 634-14 Filed 12/05/25 Page 90 of 92 Page
Case 2:10-cv-09578-CAS-AJW Document 14 Filed 05/10/10 Page 89 of 91 Page ID #:940
ID #:11502

## EXHIBIT G

## DEFENDANTS' AFFILIATED ENTITIES

ATLANTIC RICHFIELD COMPANY
Anaconda American Brass
Anaconda Ericcson
ARCO Petroleum Products Company
ARCO Products Company
Four Corners Pipeline Company
ARCO CQC Kiln Inc.
ARCO Oil & Gas Company
ARCO Pipeline Company
ARCO Chemical Company
AMOCO Chemical Company
U.S. Polymerics
BP Chemical Company
BP West Coast Products LLC

BAYER CROPSCIENCE INC.
SMC LLC (Indemnitor/Litigation Agent of Bayer CropScience Inc.)
Stuart Pharmaceuticals (Predecessor to Affiliate of SMC LLC)
Stauffer Chemical Company
Rhone Poulenc, Inc. (NY)
Rhodia, Inc. (NY)
Rhone-Poulenc Ag Company Inc.
Aventis CropScience USA LP
Aventis CropScience USA, Inc.

THE BOEING COMPANY
Boeing Satellite Systems

CHEVRON ENVIRONMENTAL MANAGEMENT COMPANY
Chevron Oronite Company LLC, a Delaware limited liability company (successor-in-interest to
Chevron Chemical Company)
Chevron Corporation, a Delaware corporation (for Standard Oil Company of California, k/n/a
Chevron Corporation, a Delaware corporation)
Chevron U.S.A. Inc., a Pennsylvania corporation (for all Chevron affiliates involved in production,
refining, and marketing)
Chevron U.S.A. Inc., a Pennsylvania corporation (for Gulf Oil Corporation, k/n/a Chevron U.S.A.
Inc., a Pennsylvania corporation, and all other Gulf affiliates)
Texaco Downstream Properties Inc., a Delaware corporation (successor-in-interest to Texaco
affiliates involved in refining, marketing and research)
Chevron U.S.A. Inc., a Pennsylvania corporation (successor-in-interest to Texaco Exploration &
Production Inc., and all other Texaco affiliates involved in production)
Texaco Downstream Properties Inc., a Delaware corporation (successor-in-interest to Getty Oil
Company affiliates involved in refining and marketing operations)

A/73310497.5

1

Exhibit G to Second Consent Decree
Case No. CV05-7746 CAS (JWJx)

CHEVRON ENVIRONMENTAL MANAGEMENT COMPANY (continued)
Chevron U.S.A. Inc., a Pennsylvania corporation (successor-in-interest to Getty Oil Company affiliates involved in production)
Chevron Pipe Line Company, a Delaware corporation
Kewanee Industries Inc., a Delaware corporation (successor-in-interest to Harshaw Chemical Company and its affiliates)
Texaco Downstream Properties Inc., a Delaware corporation (successor-in-interest to Basin Petroleum and its affiliates involved in refining and marketing operations)
Chevron U.S.A. Inc., a Pennsylvania corporation (successor-in-interest to Basin Petroleum and its affiliates involved in production)
Texaco, Inc., a Delaware corporation

CONOCOPHILLIPS COMPANY
Aminoil U.S.A.
Burmah Oil & Gas Co.
Douglas Oil Refinery
Kayo Oil Co.

EXXON MOBIL CORPORATION
Exxon Mobil Corporation
ExxonMobil Oil Corporation
Station Operators, Inc.
Mobil Oil Exploration & Producing Southeast Inc.
Mobil Exploration and Producing North America Inc.
The Superior Oil Company
SeaRiver Maritime Financial Holdings Inc.
Mobil Pipe Line Company
Mobil Technology Company
Mobil Shipping and Transportation Company
Mobil Tankships (USA) Inc.
ExxonMobil Pipeline Company
Mobil Chemical Company Inc.
Pacific Offshore Pipeline Company
ExxonMobil Research and Engineering Company
ExxonMobil Upstream Research Company
Mobil Petroleum Company Inc.

HONEYWELL INTERNATIONAL INC.
AID Garrett
Air Research
Allied Signal
Baron Blakeslee Inc.
Bendix Corp
Honeywell Inc.

A/73310497.5

Exhibit G to Second Consent Decree
Case No. CV05-7746 CAS (JWJx)

MORTON INTERNATIONAL, INC.
Thiokol/Dynachem

NORTHROP GRUMMAN CORPORATION
Northrop Grumman Systems Corporation
Northrop Grumman Space & Mission Systems Corp. F/K/A TRW Inc.
Northrop Grumman Guidance and Electronics Company, Inc. F/K/A Litton Systems, Inc.

ROHM AND HAAS COMPANY
Shipley Company, Inc.

ROHR, INC.
Goodrich Corporation (f.k.a. The B.F. Goodrich Company)

SHELL OIL COMPANY
Shell Western Exploration and Production, Inc.
Shell Western Exploration and Production, Inc LP
Shell California Production Inc.
Shell Oil Products US
Shell Chemical LP
Shell Development Company
Equilon Enterprises LLC
Pennzoil-Quaker State Company
Shell Marine Products Company
Western Farm Services

WASTE MANAGEMENT INC.
Waste Management Collection and Recycling, Inc.
Great Western Reclamation, Inc.
Waste Management of Orange County f/k/a Dewey's Rubbish Service
Chemical Waste Management, Inc.
Oil & Solvent Process Company
Western Waste Industries
WRH Industries
Universal Refuse Removal Co., Inc.
Liquid Waste Management
Bradley West

3

A/73310497.5